## ARGUED AND DETERMINED

### IN THE

## SUPREME COURT OF THE STATE OF GEORGIA,

## AT SAVANNAH,

## JANUARY TERM, 1847.

No. 1.—IRA PECK, plaintiff in error *vs.* NATHAN LAND, assignee of HENRY SOLOMON, defendant in error.

[1.] If a creditor purchase property of his debtor in satisfaction of his own debt, and the debts of other favoured creditors, and buy a large surplus over, to the exclusion of a particular creditor, whose suit is pending, it is a badge of fraud.

[2.] The possession of property, real or personal, remaining with the vendor after an absolute deed of conveyance, is an evidence of fraud.

[3.] A creditor, or third person, may pay a full and fair price to an insolvent debtor, for property, still, if the purchase is made to delay or defraud creditors of their rights, it is void as to them.

[4.] The declaration and other original papers of file in the Clerk's office, may be used in evidence, in the same Court to which they belong.

[5.] An application for a new trial will not be granted on the ground that the verdict is contrary to evidence, provided there was testimony enough to warrant the finding, and the Court was satisfied, that justice had been done. Neither will the motion be sustained for the reason, that the verdict was contrary to the charge of the presiding Judge, if the charge itself was erroneous.

*Claim* from Twiggs Superior Court, tried before Judge SCARBOROUGH—October Term, 1846.

Judgment against the plaintiff in error, who was *claimant* in the Court below, and motion for new trial overruled.

For the facts and circumstances of the case, and the error assigned, see the opinion of the Supreme Court.

HARRIS & ROCKWELL for the plaintiff in error.

Argument of Mr. HARRIS.

This case is to be determined by the Statute of 13 Eliz., ch. 5. That statute was designed for protection of creditors against deeds, &c. fraudulent in their *concoction—of those devised of malice*—and not such as in their effect merely might "delay or hinder" other creditors.—*Meux, qui tam* vs. *Howell, 4 East, 14, ed. 1805.*

It is evidently meant by the expression—fraudulent in their concoction—those transfers or assignments, without being on a valuable consideration and *bona fide* designed to sheild the vendor, by continuing him in the enjoyment of property which belongs in conscience to his creditors. Wherever such an end is contemplated, a *trust* is naturally implied.

To constitute fraud, under the Stat. of Eliz., there must be either an express or implied trust for the benefit of the vendor.— *Twyne's Case,* 2 *Coke R.,* 212.

The vague and unprecise notions too prevalent as to what constitutes fraud, must and should yield to the stern definition which the law has given to it; and although fraud is a Proteus assuming many forms, and in each and every form, perhaps, odious; yet it is not of fraud as defined by Cicero in his Offices, or by Labes, with which this tribunal has to deal—it is not with the genus, but the species, against which the Stat. of Eliz. was directed.

Fraud, sought to be remedied by that statute, appears by Twyne's case—a case decided in ten years after the enactment—a case of unquestioned authority, until doubted by the Circuit Judge—to be synonymous with a *trust.* The expressions used confirm this idea—"Here was a trust between the parties"—"Fraud is always appareled with a trust"—"A trust is the cover of fraud."

The term, "*bona fide*," used in the proviso to the statute, signifies the *non-existence of a trust.* Thus, in the second resolution— "And no estate, interest in lands, goods or chattels, though on a true and good consideration, is yet *bona fide* and within the proviso which is accompanied with *any trust.*"

Again—"And as to the gifts made *bona fide,* it is to be known that every gift made *bona fide,* either is on a *trust* between the parties, or *without* a trust. Every gift made on a trust, is out of this proviso; for that which is betwixt the donor and donee, called

a trust *per nomen speciosum*, is in truth as to all the creditors, a fraud."

"A gift, made *bona fide*, is a gift without any trust either express or implied."

In all cases, then, of transfers or assignments, the valuable consideration being proved, and in the case now before the Court no question arises in relation thereto — the chief, the only remaining inquiry is, as to the intent or motives with which they were made.— *Nunn* vs. *Wilsmore*, 8 *Term R.* 521.

No trust appears on the deeds. It is sought to raise the presumption of a trust, by alleging that the possession of the land and negroes did not accompany and follow the deeds; in other words, by the proof that Holmes, the vendor, remained on the land and continued to manage the negroes from the 27th March, 1842, (date of deed for the land,) and 31st March, 1842, (date of bill of sale of negroes,) until the levy by plaintiff in execution.

Upon the authority of *Edwards & Harben*, 2 *Term Reps.*, and other cases, chiefly American following it, it is argued, that possession not accompanying and following the deed, it is fraudulent *per se.*

The reasoning of this class of cases is most ably refuted in *Hall* vs. *Tuttle*, 8 *Wend. R.* 375. *Edwards* vs. *Harben*, is denied in *Stewart* vs. *Lombe*, by Dallas, Ch. J., 1 *Brod. & Bing.* 511, 5 *Eng. C. L.*, explained in *Martindale* vs. *Booth.* 3 *Barn. & Adol.* 130, 23 *Eng. C. L.*

The learned note of Mr. Cowen to *Bissell* vs. *Hopkins*, reported in 3 *Cowen R.* 166, must convince any mind, free from prejudice, of the utter valuelessness of a rule to which there are twenty-two excepted cases.

The case of *Leonard* vs. *Baker*, 1 *M. & Sel. R.* 251; *Watkins* vs. *Birch*, 4 *Taunt. R.* 423; *Jezeph* vs. *Ingram*, 8 *Taunt. R.* 838; *Kidd* vs. *Rawlinson*, 2 *Bos. & Pul. R.* 59 ; *Dewey* vs. *Baynton*, 6 *East R.* 257; *Reed* vs. *Blades*, 1 *Eng. C. L.*, all recognise the principle, that fraud or no fraud, is a question for the jury. In 10 *Reports*, 56, it is said by Lord Coke, "that fraud shall not be presumed, nor shall the Court adjudge it to be, until the matter is found by a jury."

Possession, then, is not a presumption *de juris et de jure.* It is remarkable, and worthy of note, that the Statute of Elizabeth says not a word about possession.— Lord Mansfield in *Cadogan* vs. *Kennet*, 2 *Cowp.* 432.

If possession continuing in the vendor be a *sign* of a trust, ac-

cording to Twyne's case, it becomes important to look to the surrounding circumstances, before such an implication be allowed to become conclusive.

*Notoriety* of transfer is a strong circumstance to rebut that presumption. *Latimer* vs. *Batson* 4 *B. & C.* 652 and *Leonard* vs. *Baker*, 1 *M. & Sel.* 251; *Mair* vs. *Glennie*, 4 *M. & Sel.*, 248 and *Ryall* vs. *Roll*, 1 *Atkins.* If done in an *open* manner, and not in secret; publicly and before the *neighbours ;* if appraised by good people and to the very value. — *Ld. Coke's advice in Twyne's Case.*

Against these, it is alleged, that other badges of fraud are apparent in this case, which require explanation ;

Ist. The generality of the sale to Peck, lands, negroes, horses, corn, carts, bacon, &c.

2d. The unbroken continuance of possession in Holmes for near three years from the sale.

3d. That the transfers were made pending the suit of Solomon, original plaintiff in execution.

In answer to the first— It is replied, that the evidence does not authorize the assertion. The bill of sale simply comprehended such chattels as were essential to stock the farm, in plantation phrase. The land having been previously purchased; and at that season of the year, in that latitude, the crop had been planted.

To the second — The negroes, &c. were delivered at the time of the sale, as appears by the evidence of Col. Crocker, the Attorney of Peck, who was taken along to advise and direct. Bullard, a neighbour of Holmes, proves the same fact. After the completion of the purchase, Peck said to Holmes, "take care of them until I can make other arrangements." This custody formed no part of the *original* agreement or contract of sale, and should not therefore be deemed a trust for the benefit of Holmes. Holmes remaining on the land and working the negroes subsequently, is not inconsistent with the deed, as the dominion of Peck was asserted by several acts, viz: the renting of additional land ; the payment of blacksmith's bill; shoes for the negroes, and more especially by the overwhelming fact, that the cotton made on the land by the negroes, was marked at the ware-house, by Bullard, in Peck's name, and shipped for him to market.

These facts are absolutely irreconcilable with the existence of a *trust* for Holmes' benefit- — *See Benton* vs. *Thornhill,* 7 *Taunt.,* 149.

To the third — It may be replied, that although in Twyne's case, this is enumerated as a sign of trust, it is extremely difficult, in

Peck *vs.* Land.

sound logic, to perceive why that should be considered as a "badge," when there can be no question as to the right of Holmes to sell, and Peck to buy, at any moment up to the rendition of judgment. A debtor has a distinctly acknowledged right to prefer one creditor to the exclusion of all others.— *Comyn. Dig., Title Covin.,* 285, 3 *v.; Holbird* vs. *Anderson,* 5 *Term R.* 236 ; *Estwick* vs. *Caillaud,* 5 *Term R.* 420.

This preference may be given even after other creditors *have commenced their actions,* unless the debtor be a *trader* in contemplation of Bankruptcy.— *Pickstock* vs. *Lyster,* 3 *M. & Sel. R.* 371; *Meux* vs. *Howell,* 4 *East; Bowen* vs. *Bramidge, C. & P.* 142 ; *Goss* vs. *Neale,* 5 *Moore,* 29. And though this is *done by the assignor expressly with a view to delay and hinder other creditors, &c.*

Both principles cannot co-exist, and at the same time, and in the same case, be applied. It savours of absurdity, to say that although it is neither illegal nor immoral for the vendor to sell pending the suit against him, yet because he does a lawful act, it shall be considered as a badge of fraud.

There is error in the charge of the Court, that where a creditor in payment of his antecedent debt, purchases of his debtor a large surplus over of property, it is a badge of fraud. No such sign of fraud is enumerated in Twyne's, or any subsequent English case, upon the Statute of Elizabeth. It is unsupported in this argument by counsel for the defendant in error, by reference to any adjudication, except the case of *Smith* vs. *Henry, in Hill's Law R., S. C.* 21. It may not be improper to remark, that when we are occupied in tracing Common Law principles we will not look into the reports of South Carolina, with a view to find them in their original purity. Bound as we are by Common Law, as usually of force in this State previous to May 1776, we should look to the English Reports before that date, for the governing rule.

This matter, however, has been settled, after able argument, by this Court, in effect, if not in terms, in the case of *Eastman* vs. *McAlpin, June Term,* 1846, *at Hawkinsville.* If that decision is adhered to now, the Court below in this case erred. The charge complained of, and that decision are irreconcilable. Without such an expression of opinion from the bench below, who can believe that the jury would have made the finding that it did.

It has been argued that the decision of *Eastman* vs. *McAlpin* was under the act of 1818. That is not denied, but it may confidently be asserted, that that act is but a re-enactment of principles

settled by the Statute of Elizabeth. Whatever motive led to it, it was but a mere processioning, a re-marking of the lines where the hand of time had laid its obliterating fingers too roughly. In that act was the spirit of the God Terminus, the best of all the Roman Gods, a plain, blunt old fellow, not smooth as chiseled marble or polished ivory; not double-faced, with an eye inwards, and with an eye also outwards, *fastened covetously on the domain of a neighbour*.

The Court below erred in disallowing the application for a new trial. The jury, without *other* proof than the possession of the land by Holmes, found it subject to the execution. In doing so, it disobeyed the instruction of the Court, and violated a clear principle of law, that possession of land in the vendor after sale, is no evidence of a fraudulent conveyance. *Ryall* vs. *Rolle*, 1 *Atkins*, 168; 2 *Hovenden* 395. Manual occupation of lands is no criterion of ownership. *Roberts on Fraud. Convey.* 549. Land is enjoyed and possessed by title. *Ibid*; 4 *Kent Com.*, 461, 456, 489.

In *Stone* vs. *Grubham*, 1 *Rolle's R.* 3, it is said that in conveyances of land, the donor continuing in possession, is not fraudulent unless it be *expressly proved that fraud was intended*.

The verdict is contrary to evidence, and a new trial should have been granted also on that ground. Here Mr. Harris examined all the facts relied on by counsel for defendant in error, as authorising the presumption of fraud in the sales, and endeavoured to exhibit their entire insufficiency for the purposes of any such result, by bringing them to the test of common sense and a sound logic. The circumstances surrounding the sales and continued possession of the land and negroes, with their use by Holmes, were condensed and presented in explanation.

He then insisted, with earnestness, that as there was no conflicting testimony, the jury was bound to have given due weight and consideration to the uncontradicted and unimpeached testimony of Crocker and Bullard; and that *it* had not by law a capricious discretion to find as it had, against and without evidence. He thought that the only safe and sound rule which this Court could adopt in disposing of cases of this description, was to order a new trial, if it would have granted one, had it presided below.

The refusal of the Circuit Judge should furnish no impediment or reason for a refusal here, since the entire case, both pleadings and evidence, are here and as fully as they existed below.

C. B. COLE, for the defendant in error.

---

Peck *vs.* Land.

---

*By the Court.*—LUMPKIN, J. delivering the opinion.

This writ of error has originated in a Claim case; a mode of trying the rights of property, unknown to the Common Law. Henry Solomon obtained a judgment against Henry Holmes in the Superior Court of Twiggs County, which being assigned over to Nathan Land, was levied on sundry property, real and personal, in the possession of the defendant; and all of which was claimed by Ira Peck. The special jury on the final trial, found the whole subject to the *fi. fa.*, and the Court below overruled a motion for a new trial, and the plaintiff in this writ the claimant in the Circuit Court, complains that Judge Scarborough, before whom this cause was tried, committed error, as well in his charge to the jury, as in refusing the application for a re-hearing. And hence it becomes our duty to examine, first, the charge, to see if it contain any misdirection; and then to look into the facts, in order to ascertain whether or not we will control the discretion exercised by the Circuit Judge, in disallowing a new trial.

The charge is as follows:

"Proof of the execution, the levy under it, and that the defendant was in possession of the property levied on, makes a *prima facie* case for the plaintiff. Then the *onus probandi* is devolved on the claimant to support his title. For that purpose claimant introduced a deed to the land, and a bill of sale to the negroes and other personal property levied on, of an anterior date to the judgment, with evidence of the consideration paid."

Judge SCARBOROUGH states the law correctly, and the practice under it, in relation to proceedings under our Claim acts: Namely, that proof of the execution, the levy under it and possession of the property by the defendant, at the date of the judgment, or at any time subsequently, makes out a *prima facie* case for the plaintiff, so as to put the claimant upon proof of his title. In Georgia, real estate, as well as personal property, is bound by the judgment and liable to be sold under execution. And although mere naked possession is the lowest and most imperfect degree of title to lands and tenements, still it is such an interest therein, as will subject it to levy and sale, unless claimed and proof is made, that the paramount title resides in another. For this mere naked possession may and will, in process of time, unless disturbed, ripen into a title completely legal. I make this remark, because much of the

Peck *vs.* Land.

argument in behalf of the plaintiff in error, has assumed the fact, that titles to land can be evidenced by deed only.

The Judge proceeds. "This is a question of fraud, and the issue submitted to the jury is, the *bona fides* or honesty and good faith of the transaction. There are badges, or evidences of fraud, which are of different imports. A badge is a circumstance, sign, mark, or suspicion, not sufficient of itself, to authorise a finding, unless more than one combine. Evidences of fraud are either presumptive or conclusive. All presumptions become conclusive, unless rebutted."

As to the dissertation of the Court upon frauds, and the *indicia* which usually accompany them, I need only say, that we are not prepared to assent to the proposition, that in order to condemn a transaction as fraudulent, that two or more of the marks of a collusive conveyance must be affixed to it. On the contrary, we should be inclined to hold, that continued possession by the vendor, unexplained, and in the face of an absolute transfer, would of itself warrant a finding that the sale was covinous. And so of the other badges. Indeed the charge itself inculcates the same doctrine, for it expressly affirms, that all presumptions become conclusive, unless explained. This is not an error, however, with which the plaintiff here has any right to be dissatisfied, and we notice it, because should it be passed in silence, it might be understood as having received the indorsement of this Court.

"The pending of the writ at the time of the sale," continues the Judge, "is a badge of fraud. If a creditor buy in satisfaction of his antecedent debt, and also in satisfaction of the debts of other favoured creditors, to the exclusion of a particular creditor whose suit is pending, and buys a large surplus over, this is a badge of fraud."

Now, if the *first* proposition be true, that it is a sign of fraud for an insolvent debtor to sell his property pending a suit against him, the *second*, which is only an amplification of the *first*, is necessarily so. For if fraud be inferred from a sale, even to a third person, much stronger will that conclusion become, when the purchaser is a creditor, and he buys not only in extinguishment of his own debt, but the debts also of other favoured creditors; and not only property sufficient to discharge these demands, but a large surplus over.

[1.] The first and main question to be settled then is, is the sale of his property by an insolvent debtor, pending a suit against him,

Peck *vs.* Land.

to the exclusion of the collecting creditor, a circumstance calculated to create suspicion, that it was done to hinder or defeat such creditor. Not whether it will have the effect of delaying such creditor of his debt; for such is the effect *pro tanto* of every transfer that can be made by one who has creditors. Every disposition of an insolvent's property, however valuable the consideration and honest the motive, diminishes the fund out of which payment is to be made of his remaining liabilities. This, therefore, is not the issue. The question is, was it done fraudulently? And was this sale, under the circumstances, an evidence that such was its character? The affirmative of this proposition was ruled distinctly to be law in *Twyne's Case*, 3 *Coke's R.* 62, nor has it ever, within the knowledge of this Court, been adjudicated otherwise. Pierce was indebted to Twyne £400, and to one C. £200. C. brought an action of debt against Pierce and, pending the writ, Pierce being possessed of goods and chattels to the value of £300, in secret made a deed of all his goods and chattels to Twyne in satisfaction of his debt, and yet Pierce continued in possession of the property, and some of it he sold, and the sheep he marked with his own mark; and afterwards C. had judgment and a *fieri facias* to the sheriff and by virtue thereof bailiffs came to make execution of the goods, and divers persons, by the commandment of Twyne, with force resisted them, claiming the goods to be Twyne's by virtue of the deed made to him, and the question was, whether or not this conveyance was fraudulent. Upon an information, *per Coke*, Attorney General, against Twyne for contriving and publishing a fraudulent deed, it was decided by Sir Thomas Egerton, Keeper of the Great Seal of England, and by the Chief Justice Topham, and Anderson, and the whole Court of Star Chamber, that this deed was fraudulent and within the Statute of 13th Elizabeth c. 5. And in this case, the following points were resolved:

*First.* That this deed had the marks of fraud. It was general and without exception of his apparel or any thing of necessity: for *dolosus versatur in generalibus.*

*Secondly.* The donor continued in possession.

*Thirdly.* It was made in secret, *et dona clandestina sunt semper suspiciosa.*

*Fourthly.* It was made pending the writ.

*Fifthly.* There was a trust between the parties; for the donor was in possession and used them, and fraud is always appareled with a trust, and trust is the cover of fraud.

2

*Sixthly.* It was contained in the deed that it was made honestly, truly and *bona fide, et clausulæ inconsuetæ semper inducunt suspicionem, &c.*

It was resolved that although it was a debt due to Twyne, and a good consideration of the deed, yet it was not within the proviso of the said act of the 13th Elizabeth, by which it is provided, that the said act doth not extend to any estate or interest in lands, &c., goods and chattels, made upon good consideration and *bona fide;* for although it be upon good and true consideration, yet it is not *bona fide;* for no deed shall be deemed to be made *bona fide* within the said proviso that is accompanied with any trust; for the proviso saith, upon good consideration and *bona fide;* so a good consideration doth not serve, if it be not also *bona fide.*

I have extracted from the report the whole of these resolutions, although it is the *fourth* only that has immediate application to the point under discussion. It will be found, however, that there are other features in this leading case altogether analogous to the one at bar. Besides, this was an early and sound exposition of the Statute of Elizabeth, and the doctrines which it promulgated although perhaps, somewhat modified and restricted, have never been overturned nor materially altered: on the contrary, they have always been recognised as sound law, both in England and in this country. *(Holbird* vs. *Anderson,* 5 *Term R.* 236; *Cadogan* vs. *Kennett,* 2 *Cowp.* 432; *Seward* vs. *Jackson,* 8 *Cowen,* 443, *et passim.)*

"And," says Sir Edward Coke at the foot of the foregoing case, " because fraud abounds in these *daies* more than in former times, it was resolved that all statutes made against fraud shall be liberally expounded, for to suppress the fraud." If the corruption of the times in the age of Queen Elizabeth, required not only the enactment of this law, but its liberal interpretation—an epoch, the most remarkable feature of the jurisprudence of which, was its antipathy to deceit, and which had already comprised within its code the notable aphorism, that even right itself is turned into wrong by circumventing to obtain it—what shall we say of our own day, when the temptations to fraud, as well as the facilities for its commission, are multiplied an hundred fold; when so many are seeking to live by their wits, instead of their labour; by cunning and craft, instead of eating their bread in the sweat of their brow.

The Statute of Elizabeth goes no further than the Common Law as now understood. I apprehend the time never was, when a fraudulent conveyance would not be invalidated, which was intended to

Peck *vs.* Land.

defeat, delay, or hinder creditors of their just debts.    And we have not only adopted the Common Law, but we have expressly incorporated the Statute of Elizabeth as a part of the law of this State, and with it Twyne's case, as a rule of construction.

The purpose for which any conveyance is made, is a conclusion from all the circumstances attending the transaction, and a sale pending a suit by an insolvent debtor is, in the nature of the case, well calculated to awaken suspicion.    The vendor is *insolvent.* And why insolvent ?    In three-fourths of the cases, I venture the assertion, from improvidence or wild speculation.    The vendor, then, overwhelmed with debt, and unable to pay, when pursued by his creditor, whose property he has appropriated, takes it upon himself to withdraw his effects from the lien about to be created, and to secure them to others.    Is it strange that the law should imply a fraudulent intent ?

Who has not marked the smile of derision curling the lip, whenever the title is quoted of our honest debtor's act ?    And does not this very act treat its beneficiary as a *suspected* person ?    Why is his conscience purged by oath ?    Why notice to creditors, with the privilege of forming an issue and testing the fairness of his surrender ?    Is it not obvious, that the law presumes an insolvent guilty rather than innocent ?    And while therefore it accords to him the privilege of making a preference, still it distrusts his motives ; and hence it requires of him every thing in the manner of making the transfer of his property, which will rebut the presumption of an interest for himself.

Again, the sale is made *pending* the suit.    Shall that suit be defeated ?    To permit it would seem to bring disrepute and discredit upon our Courts.    They are constituted to coerce delinquents into a fulfilment of their engagements.    Shall the debtor be allowed to hold the rod, *in terrorem,* over his creditors, by postponing those altogether who dare resort to their legal remedies?    Would not this policy be, to reverse the maxim, the law regards those only who watch, and not those who sleep ?    Shall the debtor not only get his creditor's property without compensating him for it, but mulct him with the expense which he has incurred in suing out his writ ?    Does not the principle, *prior in tempore, potior in jure,* equitably apply to this case ?    If equality is equity, then is this preference strongly tainted with fraud and injustice.    If there be a preference given, it would seem to be due to those who are *first* in the race.    But in this case, the first is made *last,* and the *last,*

*first.* The inference is irresistible. Every such voluntary disposition, by an insolvent, creates distrust as to his motives. They may be meritorious. The law allows the right to the debtor upon the supposition that he knows best whom to favour. Experience demonstrates, however, that this is a fiction, and that the exclusion of the vigilant creditor is the result of irritation, and for no better reason is his recovery defeated. In nine cases out of ten the debtor is influenced by the determination to thwart the particular creditor, or to secure an interest to himself in the arrangement. Either of these facts will invalidate the conveyance. And a sale, pending a writ, is clearly evidence of one or the other of them.

[2.] But to return to the charge :

" The possession of the vendor, after an absolute sale of personal property, is now only *prima facie* evidence of fraud, and is open to explanation. Possession of land remaining with vendor, after an absolute deed, is not, under the Statute of 13th Elizabeth, c. 5, an evidence of fraud."

As it respects the sale of personal property, we cheerfully concur in the opinion of the Court below. The science of jurisprudence, like all others, is progressive ; and notwithstanding it was settled, and repeatedly held at home and abroad, that an absolute bill of sale of chattels, unaccompanied with possession, was fraudulent in law, and void as against creditors, yet the Courts every where are adopting the less rigid rule, that the vendor's retaining possession after an unconditional sale, was not conclusive, but only *prima facie* evidence of fraud and susceptible of explanation ; that strictly speaking, there is no such thing as fraud in law, and that fraud or no fraud, is, and ever must be, a question of fact to be found by the jury. *Wash* vs. *Medley*, 1 *Dana (Ken.) R.* 269; *Sterling* vs. *Van Cleve*, 7 *Halsted R.* 285; *Howell* vs. *Elliott*, 1 *Dev. R.* 76; *Callen* vs. *Thompson*, 3 *Yerger R.* 475; *Ibid*, 502; *Bissell* vs. *Hopkins*, 3 *Cowen R.* 166; *Adams* vs. *Wheeler*, 10 *Pick. R.* 199; *Haven* vs. *Lowe*, 2 *N. H. R.* 13; *Eastwood* vs. *Brown et al.* 1 *Ryan & Moody R.* 312; *Storer et al. assignees of Ketcher, a Bankrupt*, vs. *Hunter*, 3 *Barn. & Cressw. R.* 368; *Martindale* vs. *Booth*, 3 *Barn. & Adolph. R.* 498.

We are constrained to dissent, however, from Judge Scarborough as to real estate. It is true, that the ownership to lands is usually evidenced by deeds and other written muniments of title. Still, in real as in personal property, we hold, that if the vendee take an absolute conveyance and nevertheless leave the property

Peck *vs.* Land.

in the possession of the vendor, it is *prima facie* evidence of fraud. If a man convey his land absolutely, and yet is allowed to continue in possession as its absolute, unqualified owner, this will be a proof that the conveyance is fraudulent. (*Newland on Contracts*, 372; *Stone* vs. *Grubham*, 2 *Bulst. R.* 226 ; *Hungerford* vs. *Earle*, 2 *Vernon R.* 261; *Styleman* vs. *Ashdown*, 2 *Atk. R.* 479; *Russell and others* vs. *Hammond and others*, 1 *Atk. R.* 13, 16.) If, says Lord Coke, a man mortgage his land and continues his possession, no disseisin is wrought by this. If it was an absolute conveyance and a continuance in possession afterwards, this shall be adjudged in law to be fraudulent.

In *Sands* vs. *Codwise*, 4 *Johns. R.* 503, the question related to real estate, where it is certainly true, that possession is much less important than it is in relation to personal property, yet the Court of Errors of New York thought it strong evidence of fraud that the grantor continued after the sale to exercise acts of ownership.

In the case before us, the sale was made pending an action by the defendants in error, for the collection of their debt. There was no change of possession; and what explanation is offered of this strong evidence of fraud? None other, except that the purchaser remarked to the debtor at the time that the deed was executed, "*remain here until I can make other arrangements,*" and at the expiration of several years the vendor is still found in the occupancy and enjoyment of the property. It is not even attempted to be shown that he acted as the agent of Peck, the most plausible account that could have been given of this continued possession. But this would not have availed. The change of possession must be actual and complete, and a divided enjoyment which leaves the vendor to appear to the world as the owner, will not do.

Lord Ellenborough, in the case of *Wordall* vs. *Smith*, 1 *Camp. R.* 332, said, " it was a mere mockery to put in another person to take possession jointly with the former owner, and that a concurrent possession with the assignor by the assignee, was colourable. He declared that the possession must be conclusive to protect the transfer."

With all the facts of this case before me, I will not say with a distinguished jurist in a similar case, that within the two and a half centuries which have elapsed since the Legislature first came to the aid of the Courts for the suppression of fraud against creditors, there never has been a time when this transaction could stand the test of a judicial investigation ; yet I will affirm, that the facts

developed in this case, not only created a presumption of fraud, but warranted the most scrupulous and searching examination.

The Statute of 13th Elizabeth, c. 5, relating to frauds against creditors, directs, that no act whatever done to defraud a creditor or creditors, shall be of any effect against such creditor or creditors. We concur fully with the Circuit Judge, "that the fact that the claimant paid a fair price for the property is not a sufficient explanation of the transaction." , The question still occurs, was the conveyance made in good faith ? And does not the continued possession, together with the joint, if not the whole, reception of the profits impress the *mala mens* upon it ?

[3.] In the case of *Cadogan* vs. *Kennett*, 2 *Cowp. R.* 432, Lord Mansfield stated, that he had known several cases where persons have given a fair and full price for goods, and where the possession was actually changed, yet being done for the purpose of defeating creditors, the transaction has been held fraudulent and therefore void. It is assisting one man to cheat another, which the law will not allow.

Judge Scarborough charged the jury, "that the circumstance that Mrs. Holmes, the wife of the defendant, sold two or three loads of corn and three bags of cotton during the absence of her husband at the North, ought not to be admitted as proof of fraud against the claimant."

It will be kept in mind, that Holmes, the original defendant, was not a party to the proceeding below. But the contest was between Peck, the claimant, and the plaintiff in execution. If Peck therefore, having in his pocket the title papers to the land and negroes, stood by and permitted Mrs. Holmes, the wife of the defendant and vendor, to sell the corn and cotton made on the plantation, this is a circumstance going to establish the covinous intention between the parties to this transaction, and that a trust had been reserved for the benefit of the vendor's family. And it would seem that the absence of Holmes had nothing to do with the matter.

Counsel for the plaintiff in error have presented with much confidence, this view of the case. By the Common Law, a debtor was allowed to prefer one set of creditors to another; the Statute of Elizabeth does not militate against this right. And although in the preamble to the act of 1818, the practice of selecting particular creditors to the exclusion of the rest, is denounced as " contrary to the first principles of equity and justice, still the privilege of making this preference is expressly secured by the body of that

Peck *vs.* Land.

statute, provided the disposition of the insolvent's property be "*bona fide and absolute, and free from any trust for the benefit of the seller or any person or persons appointed by him, her or them.*" And such is the construction put upon this act by this Court. It is demanded then, how can the doing of that be fraudulent which the law authorises to be done ? If an insolvent debtor, at any time before judgment, can sell the whole or any part of his property, either to a creditor in satisfaction of his antecedent debt, or to an indifferent person for money or other thing, how can it be deemed a badge of fraud to execute a conveyance under these circumstances ?

This inquiry may be answered by propounding another. May not the purchaser of property suffer it to remain in the possession of the seller ? Is it either illegal or immoral to do so ? And yet the doing so, is not only a cogent badge of fraud, but, unexplained, will condemn the transfer as void. An insolvent debtor may dispose of his goods *in secret*, to a near relation, still, should he do this, the transaction would be shrouded in a shade so dark, that it would be difficult to extricate and sustain it. Any one of the badges in Twyne's case would singly impeach the assignment of property ; nevertheless, the whole of them might unite and many more be superadded and, still the conveyance protected. A man presents his pistol and snaps it within a foot of the head or heart of another. Under this evidence he would be convicted of an assault, with intent to murder. He proves, however, by witnesses, that the pistol was unloaded, and that it was a mere trick to try the other's metal, and he is acquitted. Is there any thing inconsistent in this ?

It is contended that the Court below erred in admitting in [4.] evidence the original writ to prove the pending of the suit. We think otherwise. We apprehend that it is the every-day practice of all the Courts to allow the original papers of file in the office to be used in evidence in the same Court. Bills and answers, as well as verdicts and decrees in chancery, while in paper, are constantly offered to prove a particular fact. In this instance, the writ is produced merely for the proof of the *res ipsa*, namely the pending of the suit.

The special jury having found the property subject to the [5.] execution, an application was made for a new trial, on the following grounds, to wit :

*First.*   That the jury found contrary to evidence and without evidence.

*Second.*   That the jury found contrary to law.

*Third.*   That they found contrary to the charge of the Court.

If it were true, as assumed in this rule, that the verdict was without evidence, there would be no doubt in the case.   The judgment below would have to be reversed and a new trial ordered. But by looking into the testimony, we are satisfied that such is not the fact.   The rule for our guidance is clearly defined in the books, and is this, " *that the verdict will not be set aside as contrary to evidence, where there has been evidence on both sides, and no rule of law violated, nor manifest injustice done, although there may appear to have been a preponderance of evidence against the verdict.*"   2 *Strange R.* 12, 38; 7 *Taunt. R.* 153; *M. & Sel. R.* 192; 1 *Burr R.* 11; 10 *Johns. R.* 101; 1 *Cowen R.* 77; 2 *S. C. Cond. R.* 337, 441; 6 *Conn. R.* 185; 2 *Miller, L. R.* 12, 21, 449; 2 *Str. R* 1142; 2 *Wend. R.* 352; 15 *Johns. R.* 493; 8 *Conn. R.* 223; 3 *J. J. Marshall R.* 421; 7 *Wend. R.* 270; 5 *Mass. R.* 353; 3 *Call R.* 276; 2 *Vermont R.* 165; 8 *Peck R.* 182; 1 *Ham. (Ohio) R.* 357; 1 *Hayw. R.* 14, 132; 3 *McCord R.* 276; 1 *Cowp. R.* 37; 10 *East R.* 268; 6 *Term R.* 619.

If it be true that in *all* cases, facts are the peculiar province of the jury, and that it is for them to say in any given case, whether the proof produced be sufficient or not, much more will the Courts refrain from disturbing the verdict when a question of fraud is submitted to the jury.   1 *Hill R.* 467.

In conclusion, we will advert briefly to the testimony in reference to two points only, that is, the continued possession of Holmes, the vendor, and the acts of ownership exercised by him subsequent to the sale to Peck.

E. E. Crocker testified as to the sale and formal delivery of the property, that the consideration was $1,700, which Peck held individually on Holmes, $500 or $900 in debts due by Holmes to Wiggins, Reynolds and others, and Peck gave his note for $1,000, the balance of the purchase money at the time of the sale..   *Peck told Holmes to take care of the property until he could make other arrangements; none of the property was taken away at that time.*

Bullard swore that Holmes continued to live on the plantation after the sale and work the property.

John Hughes stated in his examination, that Holmes hired him (witness) in 1845, to superintend the saving of his fodder, while he

Peck *vs.* Land.

went to the North. Cherry and Phillis (two of the negroes sold to Peck) were there. Holmes' family resided on the place. Holmes paid witness for said service. Witness let Holmes have ploughs and gear, which he was to return, but never did—he paid witness for them—*never saw any one else in possession but Holmes.* His wife sold two or three loads of corn, while her husband was absent, and three bags of cotton, made by the children of Holmes and the negroes—saw Peck two or three times in the latter part of 1843. Holmes gathered witness' fodder in 1844, and Bullard paid witness five dollars for Holmes; all the balance Holmes paid in work. Witness repaired the gin house in 1843, and Holmes settled with witness at the rate of one dollar per day.

William Stafford testified, that Holmes ginned his cotton in 1842 and 1843, and witness paid him for it. Aleck packed it and Phillis fed the gin, (these negroes were a part of those sold by Holmes to Peck.) Witness paid Holmes the thirteenth part in money after he sold the cotton.

Charles Whitehead states, that he rented land to Holmes in 1843, and, subsequent to the sale to Peck, Holmes paid witness for the rent, partly in fodder made on the land. The land was cultivated by the negroes sold by Holmes to Peck.

Well might the Court below not think it a discreet exercise of its power to interrupt the finding of the jury against the claimant, upon such evidence.

A majority of this bench would have come to the same conclusion, to wit, that the facts fully warrant the belief, that as to the surplus at least, there was a benefit reserved to the vendor and his family, and the contract being entire, if part of it be tainted with fraud, the whole must fail. It is void altogether.

Were it otherwise, and we believed the verdict against the weight of evidence, still the Judge, who tried the case, being satisfied with it, this Court would decline to set it aside. It must be a very strong case that would induce this Court to order a new trial, when it has been refused by the presiding Judge *on the merits.*

The verdict then, in our opinion, is not contrary to law, but in conformity with it; and it is only repugnant to so much and such parts of the charge as were against law, and on the side of the claimant; of course that would not authorise us to intermeddle with it. The motion for the reversal of the judgment below, must therefore be denied.