## McINERNEY v. UNITED STATES.

(Circuit Court of Appeals, First Circuit. February 26, 1906.)

### No. 584.

**1. STATUTES—RULES OF CONSTRUCTION—CRIMINAL STATUTE.**

The rule that a criminal or penal statute must be strictly construed does not mean that its language must be given the narrowest interpretation, but contemplates a reasonable construction in aid of the purposes of the act, and courts should adopt that sense of the words which harmonizes best with the context and promotes in the fullest manner the apparent policy and objects of the Legislature.

[Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Statutes, §§ 322, 323.]

**2. RECORDS—DEFINITION AS USED IN CRIMINAL STATUTE—RECORDS OF COURT.**

In Rev. St. § 5403 [U. S. Comp. St. 1901, p. 3656], which makes it a criminal offense to steal or destroy "any record, paper or proceeding of a court of justice," or "any paper or document or record filed or deposited in any public office or with any judicial or public officer," the words "record" and "document" are not limited in their meaning to the technical common-law records of courts as enrolled, or to technical documents, but are used in the common and ordinary sense, and include all and every part, not only of such technical records or documents, but of any paper filed and which becomes a part of the records of the court or office, broadly speaking, and is treated as a record of what it contains.

**3. SAME—FEDERAL STATUTE—STEALING OR DESTROYING.**

The original application of an alien for naturalization filed in a court of the United States, together with the affidavits, certificates and record of proceedings thereon, preserved in the office of the clerk, bound in one of a series of books kept for the purpose, and which are evidence of the rights of the applicant as a citizen, constitute a record of the court within the meaning of Rev. St. § 5403 [U. S. Comp. St. 1901, p. 3656], and the stealing or destruction of any part thereof is a criminal offense thereunder.

**4. SAME—PROSECUTION—DEFENSE.**

It is not a defense to a prosecution under Rev. St. § 5403 [U. S. Comp. St. 1901, p. 3656], for stealing or destroying a record of a court that such record was technically imperfect or incorrectly kept.

**5. CRIMINAL LAW—EVIDENCE—PUBLIC RECORD.**

A verified copy of a ship's manifest containing a list of its alien immigrant passengers, and giving their names, nationality, last residence, and destination, delivered to the inspection officers of a port of the United States as a report, under the requirement of Act March 3, 1891, c. 551, § 8, 26 Stat. 1085 [U. S. Comp. St. 1901, p. 1298], and preserved in the immigration office, is a public record, and when produced by the proper custodian is admissible as evidence of the facts stated therein.

**6. SAME—IDENTITY OF PERSON—EVIDENCE.**

On the question of the identity of a defendant on trial and an alien immigrant who arrived in this country on a certain vessel, descriptive matter relating to the immigrant stated in the report of the vessel's commanding officer to the immigration officers, giving his name, age, nationality, place of birth, and port of arrival in this country, corresponding closely in each particular with the facts relating to defendant as shown by other evidence, is admissible as circumstantial evidence, its weight to be determined by the jury.

In Error to the District Court of the United States for the District of Massachusetts.

Harvey H. Pratt (Henry F. Hurlburt and Isaac F. Paul, on the brief), for plaintiff in error.

William H. Lewis, Asst. U. S. Atty. (Melvin O. Adams, U. S. Atty., on the brief).

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. The defendant was indicted under section 5403 of the Revised Statutes [U. S. Comp. St. 1901, p. 3656], which was enacted for the purpose of protecting records, papers, and proceedings of courts of justice, and papers, documents, and records filed or deposited in the public offices of the federal government.

The defendant was charged in four counts. In the first count it was alleged that there was in the office of the Circuit Court of the United States for the District of Massachusetts a certain public record of a court of justice of the United States, which was known as the "record of the citizenship of one James McInerney," and that the defendant unlawfully took it and carried it away with intent to steal.

The second count sets out that there was a certain document in the clerk's office, the document then and there being a record of the naturalization and admission to citizenship of one James McInerney, which the defendant unlawfully took and carried away with intent to steal.

The third count charges the willful and unlawful destruction of the record described in the first count; and the fourth count charges the willful and unlawful destruction of the document described in the second count.

Without setting out the assignments of error in detail, it may be said that they relate largely to the question whether the thing described in the indictment and in the proofs as taken and destroyed was a record, or a document which was a record within the meaning of the statutes.

It is quite apparent that Congress, in this sweeping statute, did not intend to limit the act in its operation to a record of a judicial proceeding, as enrolled in its entirety. It cannot be possible that it was only intended to protect an entire record, and that the statute should have no force against an offender who mutilates or destroys a part of a record, or against one who destroys documents or papers which constitute a part of the original record or files in a judicial proceeding, or against one who destroys papers or documents or detached records filed or deposited in the public offices of the federal government. If the statute were to be so narrowly and so strictly interpreted, the evident purpose of the lawmaking power would be defeated in a very substantial degree. We assume, therefore, that it was not only intended to declare it to be an offense to willfully destroy an entire record, but as well to make it an offense to steal or destroy any part thereof, or any document or paper filed or deposited in the offices of the clerks of the United States courts in the course of judicial procedure, or any paper, document, or record

filed or deposited in any of the public offices of the federal government; the purpose being to preserve them as evidence relating to things which concern the public and the government.

Such being the manifest purpose, it only becomes necessary to consider whether the thing alleged to have been taken and destroyed was within the fair meaning of the statute, and whether the thing was described with sufficient legal accuracy in the indictment, and whether there was any substantial variance between the proofs and the allegations.

The thing is described in one set of counts as a public record of a court of justice, as a record of naturalization and admission to citizenship, and as a record contained in a book numbered and lodged in the clerk's office. In the other set of counts it is described as a document filed and deposited in a public office, and as being a record of naturalization and admission to citizenship, and as a document contained in a book numbered 256 of the records of naturalization proceedings. What was taken and destroyed, according to the proofs, was two sheets, or four pages, which contained the original application of James McInerney for naturalization, with the certificate of the clerk that the oath was administered to the petitioner before the court, on which was the impression of the official stamp of the United States Circuit Court for the District of Massachusetts, indicating the date on which the application was filed. The sheets also contained the affidavits of the witnesses and the certificate of the clerk or a deputy that the affidavits were sworn to by the witnesses in the presence of the court, together with the date; also the oath of allegiance administered to the applicant upon his admission to citizenship; the certificate of the clerk that the oath was taken and that the applicant was admitted to become a citizen of the United States; and a certificate that the court ordered a record to be made thereof accordingly. The sheets also contained an impression of the official stamp of the Circuit Court, recording the date on which the case was decided. These sheets or documents had been bound into a large volume kept in the vaults connected with the office of the clerk, with several hundred similar volumes. There was inscribed on the back of the volume, in prominent letters and figures, the following: "RECORD OF NATURALIZATION. Vol. 256. NOV. 20, 1894 to JAN. 10, 1895. UNITED STATES CIRCUIT COURT." There was also bound into this volume an index to the cases which it contained. In the index is the name of McInerney, James, with figures referring to page 144, which page, according to the evidence, had reference to the naturalization case to which the index referred, and that page, together with everything following it which related to the case of James McInerney, was cut from the volume. These sheets or pages bound in such volume contained all the existing record of the naturalization of James McInerney, and, according to the evidence, everything about the case was taken and destroyed, except the index name and reference to the page.

The evidence tends to show that under a practice or a system which has been in vogue for a long time, the papers, documents, and

the proceedings in naturalization cases are not enrolled or extended upon the records as is done in adversary civil and criminal proceedings, but in instances where the applicant is admitted to citizenship the original papers and documents, together with the certificates, are bound into volumes which are preserved in the custody of the clerk as the only record of naturalization cases. Such a record, of course, is not strictly a common-law record, which means an enrollment of the documents in a record extended by the necessary incidental formalities. It is, however, a muniment of the applicant's title to citizenship, and though the papers and documents are an original rather than an enrolled record, in view of their association with a judicial act, and in view of their established judicial recognition, they are so far a record of the events involved as to be evidence of citizenship in proceedings, which put in question the applicant's right to exercise the privileges and have the protection of an American citizen at home, and so far a record as to be evidence in situations which involve the question whether he shall be protected by the United States government as an American citizen abroad; and thus it was clearly something which should not have been destroyed or stolen from the records or files of the courts. This being so, and such being its weight by reason of its fixed connection with an actual investigation and judicial act, which in a judicial proceeding established a right, it was a record within the fair meaning of the statute.

The word "record," when used in the sense of a record in a judicial proceeding, has been described as "a precise statement of the suit from its commencement to its termination, including the conclusion of law thereon, drawn up by the proper officer for the purpose of perpetuating the exact state of facts." Lord Coke says, "Records are memorials or remembrances on rolls of parchment." Clearly enough the word "record," used either by courts or in statutes, in connection with the idea of a thing which shall be conclusive upon questions of law and fact in adversary proceedings, would mean a formally extended record; because, in order to be conclusive as between adversary parties, it must necessarily be complete, and the word used in such a connection means a copy of the papers from beginning to end spread upon the record books. But in a statute like the one in question, intended to protect government archives, the view is entirely different, because the word is used in a popular, or at least in a more general, sense. The purpose of the statute was not to describe a record which shall conclude rights, but records to be protected from destruction, and the purpose changes entirely the point of view, and consequently the sense of the words employed.

It being a penal statute, however, it is, of course, subject to the rule of strict construction, but such general rule contemplates a reasonable construction in aid of the purposes of the act. Lewis' Sutherland Statutory Construction, §§ 528–534. It does not mean the narrowest interpretation (Sutherland, § 529), but that courts should follow the true intent of the Legislature and adopt that sense

·of the words which harmonizes best with the context and promotes in the fullest manner the apparent policy and objects of the Legislature. United States v. Winn, 3 Sumn. 209, Fed. Cas. No. 16,740; United States v. Hartwell, 6 Wall. 385, 395, 396, 18 L. Ed. 830; United States v. American Sureties Co. (Sup. Ct.; Jan. 2, 1906) 200 U. S. 197, 26 Sup. Ct. 168, 50 L. Ed. ——.

Unless there is something in a statute to indicate otherwise, common-law words would ordinarily be accepted as used in the common-law sense, and technical words in the technical sense; but words in common use, when adopted in a statute, are to be accepted more liberally and in accordance with their common signification, when such purpose is apparent. Sutherland, § 358. The common and ordinary use of the words "record" and "document" obviously makes them include in their popular acceptation more than common-law records ·or technical documents.

As a matter of common knowledge,. many papers and documents filed in course of judicial procedure are commonly known as a part of the record, though not spread upon the rolls; and if, from the nature of the situation, or from a long-continued and recognized practice, an original paper or document, though not spread upon the records, is treated as a record of what it contains, it would be a record or a document which was a record within the meaning of the statute, though not technically complete, or technically a record or a document.

The words "any record," as used in the statute, are broad enough, under reasonable construction, to include any part of a record. Two lines, or one line even, from a page of a record of a thousand pages, would be a record of the facts stated in the one or two lines, and would therefore be a record within the meaning of the statutory words "any record." The test of·criminality cannot turn upon the question whether an offender succeeds in getting two-thirds of the record, instead of the whole, nor can immunity be made to rest upon the point that the record taken and destroyed was not technically complete, or that documents or papers filed or deposited in public offices, as a part of the government archives, were not technically complete in all respects. To illustrate the scope of the words "any record" used in the statute with reference to the public offices, the report of a commanding general as to the operations of an army, or of a naval commander, are undoubtedly, within their meaning, records of the operations in question, though they are never spread upon record books proper, and though they are not a record in any ·common-law sense. An unsigned memorandum in the handwriting of such an officer, deposited or filed in the proper office, would clearly enough in the sense of the statute be so far a record of the events to which it relates as to render a person responsible who takes it from its public place and destroys it. So it would be with respect to the reports of the commandant at West Point or Annapolis in which the doings there and the status of the various persons and things are preserved; or the report of the head ·of the Weather Bureau. None of these things are extended as a record proper, but

they contain, none the less, a record of the events which they perpetuate, and the record resides in the original in the sense of this statute. Suppose an officer in charge of a geographic exploration and survey should, in addition to a general report, lodge in the proper public office a diary covering comprehensively and in detail the events of a year, though unsigned, and though neither a record, a document, or a paper, in a technical sense; it would in the ordinary and popular sense be a record of important events, and as such it would be a record entitled to protection within the meaning of the statute. The same is true of historic papers, deposited in the public offices. They are records of events and entitled to statutory protection, if the legislative branch of the government uses the word "record" in that sense.

The statement of the case which we are now considering is designated in our system of practice as the "record." Such is true of all transcripts which, under federal procedure, come from the lower courts to the appellate courts, and which, though not extended, and never a record in the technical common-law sense, would unquestionably be a record in a proceeding of a court of justice within the sense of the terms used in the statute under consideration.

In a statute like this there is no more occasion for a narrow construction of the words "record," "paper," or "proceeding," when used in connection with the courts or the clerk's office, than exists with reference to the words "paper," "document," or "record" when used in connection with the phrase "any public office," and a construction of its terms which would make the guilt of an offender who steals or destroys a muniment or record of a right like the one in question depend upon whether the thing alleged and proved was a technical common-law record, or a technical common-law document, or whether it was critically complete by way of enrollment, would wholly destroy the usefulness of a salutary law. It would be a curious condition of things, in view of this statute, if a man, who gets access to the clerk's office, takes down a volume authoritatively designated as "Circuit Court Records," and stealthily cuts out and destroys pages which contain the official certificate of the clerk and the impression of the official stamp used in connection with court proceedings, and which contain all the existing record of a naturalization case, shall have immunity from criminal responsibility and escape liability under a judicial construction of the statute which limits its operation to technically complete and perfect common-law law records. Such a condition and such a construction would overthrow the intention of the lawmaking power, and would offend the moral sense and the intelligence of the whole country.

The case of United States v. De Groat (D. C.) 30 Fed. 764, which involved an indictment under the statute in question, though turning upon another point, assumed that papers and documents were records.

In our view a citation of authorities is quite unnecessary, and it may perhaps be said that there are no authorities directly in point to the question which we are considering, but it has been held in numerous cases, which have an analogous bearing upon the situation

here, that original papers and documents are a part of the record. In that class are Gagliardo v. Crippen, 22 Cal. 362, where, under a statute, affidavits were held to be part of the record; so in Cord v. Southwell, 15 Wis. 211, in respect to a stipulation between parties as to an order of sale; so in Lemonds v. French, 4 G. Greene (Iowa) 123, as to motions, notices, and the rulings of the court under a code; likewise the findings of a court in Smith v. Lewis, 20 Wis. 350; a bill of exceptions in Mead v. Walker, Id. 518; findings of fact in Sutter v. Streit, 21 Mo. 157; findings of fact and conclusion signed by a judge and filed in Button v. Ferguson, 11 Ind. 314; a submission and an award which becomes the basis of the judgment in Buntain v. Curtis, 27 Ill. 374; an opinion of the trial court as to facts in Gregg v. Spencer, 96 Iowa, 501, 65 N. W. 411, and in Cummins v. Woodruff, 5 Ark. 116, that a writing obligatory brought into a case by oyer became a part of the record.

The original papers filed or deposited in the clerk's office and existing in a detached condition have often been accepted as embodying the record of the suit, and some authorities hold that the originals are evidence even after the formal record has been made up. In Sutcliffe v. State, 18 Ohio, 469, 51 Am. Dec. 459, which was a case in the criminal class, detached original papers, not carried forward into the record books, were received as evidence upon the trial against the objection that they did not constitute the record, and they were admitted upon the distinct ground stated in the charge to the jury that the papers were the record in the cause, and this was sustained by the Supreme Court as applicable to both civil and criminal cases in situations where no formal record has been made. See, also, Sharp v. Lumley, 34 Cal. 611, 614; State v. Bartlett, 47 Me. 388, 401; Day v. Moore, 13 Gray (Mass.) 522; Allis v. Beadle, 1 Tyler (Vt.) 179; Buffington v. Cook, 39 Ala. 64; Watts v. Clegg, 48 Ala. 561; Peck v. Land, 2 Ga. 1, 46 Am. Dec. 368.

Holding the view that the statute should be accepted as one intended to cover judicial records, without regard to whether they are technically records, or whether they are technically complete, and basing such view upon the idea that the words of the statute were used in a broader and more liberal sense than that which would only include formal records in all respects regular and complete, we need not deal with the third assignment of error, which directs itself against the manner in which the naturalization papers and the certificates and stamped impressions were made and the manner in which they were made up into volumes, further than to say that a construction of the statute which would permit a defendant to justify a destruction of public records and documents upon the ground that they were open to technical criticism would at once reduce the statute in question to an absurdity. Sustaining such a view would be equivalent to saying, if public records or documents are open to criticism on the ground of irregularity, so far as statutory protection is concerned, they may be stolen or destroyed.

The only remaining questions relate to the evidence tending to show when the defendant came to this country. This evidence was

introduced by the government for the purpose of showing motive; the claim being that the defendant came so late that he could not have been legally naturalized at the time he was admitted to citizenship, and that the motive for his destruction of the record of naturalization resided in the idea of avoiding the danger of an exposure of a fraudulent act in connection with his naturalization.

The questions on this phase of the case arise in respect to the manifest of the steamer Cythia, which arrived in Boston Harbor in May, 1892. The manifest, upon which appeared the name of James McInerney, with certain descriptive matter, was admitted in evidence to show motive, and it is urged in effect, first, that the statute did not require the report to be in writing or that it be kept, and that the paper was not a record of a character to be admissible as evidence of the fact that any McInerney arrived in this country upon the steamer Cythia; and, second, that the proofs did not identify the defendant as the McInerney named in the paper.

We will first consider the question of the admissibility of the manifest. It is urged that the manifest in question was not required to be kept, and therefore had no force after it had performed its function of notifying the immigration office as to the number and character of the aliens seeking admission to the United States. This point was decided against that view in Evanston v. Gunn, 99 U. S. 660, 666, 25 L. Ed. 306, where it is said that the admissibility of records kept by public officers does not depend upon a statute requiring them to be kept. It is also urged that a written report was not required by statute, and as to this we think it entirely clear, in view of the character of what was to be reported, including name and general descriptive matter in respect to every alien passenger, that the act intended a written report. The official verification contemplated and imperatively required by the statute would be altogether impossible and out of the question upon a verbal report of the names and descriptive matter of 500 or 1,000 alien passengers.

It would seem to be settled upon authority that a manifest, or a report, like the one in question, made by a designated officer under the positive requirements of a statute regulating the manner in which such officer shall discharge a quasi public duty, delivered to a proper officer of the government which confers the authority and imposes the duty, and produced by a proper custodian from the proper government office, so far partakes of the character of a public document as to become evidence of the facts which it contains and which it is by law required to set out.

Section 8, c. 551, Acts March 3, 1891, 26 Stat. 1085 [U. S. Comp. St. 1901, p. 1298], declares:

"That upon the arrival by water at any place within the United States of any alien immigrant, it shall be the duty of the commanding officer and the agents of the steam or sailing vessel by which they come, to report the name, nationality, last residence and destination of every such alien before any of them are landed, to the proper inspection officers."

And it would seem that under such requirement there was delivered to the immigration office at Boston a copy of the ship's mani-

fest, which was made out by the purser and verified by the oath of the captain.

The admissibility of a paper of a public character would not depend upon its strict regularity. If made by authority and under positive law, and in accordance with its substantial requirements, it would be sufficient.

We perceive no substantial difference between the requirements of the statute here and those of the English statute, under which, upon very forcible reasoning, it was held in Richardson v. Mellish, 2 Bing. 229, that the list of passengers returned by the captain under the authority of the English act was admissible evidence as against third parties. The principle of the English case was apparently adopted with approval by the Supreme Court of the United States in Buckley v. United States, 4 How. 251, 258, 11 L. Ed. 961.

In the case of Evanston v. Gunn, 99 U. S. 660, 666, 25 L. Ed. 306, the record was kept by a person employed in the signal service of the United States, but the Supreme Court did not base its admissibility so much upon official capacity as upon the idea that the record was made by a person whose public duty it was to record truly the facts stated, and upon the idea that it was of a public character, and kept for public purposes.

It must be borne in mind that the statute in question relates to the public good, and its object is, under positive law, to preserve data with reference to immigration. The general proposition is sometimes made in the books, and it has some support upon the authorities, that, whenever a person is by law required to make a report or return of his acts, the report is a public record. We need not accept this general and extreme proposition, because it must be subject to some qualifications, and the admissibility of a given document must, after all, largely depend upon its character and the nature of the facts to which it relates. Here, however, there was a positive statutory designation of the commanding officer and the agents of the vessel, and the unquestionable purpose of the act requiring a ship's manifest to contain a list of alien passengers with certain descriptive matter was to preserve record data for the protection of the government and as an aid in the enforcement of its laws in the interests of the public good, and it therefore goes without saying that such public consideration and such authoritative requirement clothes the quasi public document or record with a force and sanctity which it would not otherwise possess.

Neither the English case nor the American cases make the admissibility of the document depend so much upon the strict official capacity of the person making the report, as upon the nature of the act and upon the idea that it was an act done in discharge of a duty of a public character under the authority and under the requirements of the law.

Certain entries in a ship's logbook bear close analogy to the statutorily required entries upon a ship's manifest or alien list. Both Greenleaf and Wigmore treat certain required logbook entries as admissible against a ship whose master made the entries, and against

143 F.—47

the party about whom the law requires the entry to be made. Such limited rule of admissibility is based, apparently, not upon any express statutory provision that the entry shall be evidence, nor upon general principles, but upon the quasi public nature of the act involved in the entry, and the requirement of the law that the personal entry shall be made. This limited rule of admissibility is quite sufficient for the purposes of the analogy. Wigmore suggests, however, that the further argument may be made that, although a merchant ship's log is not kept under an official duty, it is at least kept under a duty imposed by law, and therefore ought to be admissible upon principle. Such suggestion doubtless means that something can be said in favor of the general admissibility of such a document, but that view we need not consider in this case. 1 Greenl. Ev. § 495, and notes; Wigmore on Ev. § 1641, and notes.

It appears that manifests like this, after being verified by the United States Immigration Inspectors, who go on board and call off the names of persons and examine them, and check off answers and questions, are bound in book form, according to the practice of the immigration office, and the one in question was produced at the trial from that office, and the conclusion is that it was admissible for the purpose of showing the collateral fact that some person by the name of James McInerney arrived in Boston upon the steamer Cythia in May, 1892, and if showing by way of description that he was male, and 20 years of age, of Irish nationality, that his last residence was Ireland, that his destination was Massachusetts, and that his occupation was that of farm laborer.

The further position is that, if the manifest would be admissible in a proper case as a record, the facts which it contained should not have been read to the jury, because, as it is claimed, they were in no way connected with the James McInerney on trial. If they were not connected in such a manner as to make them material on the question of motive, it results unquestionably that the manifest was incompetent, because wholly irrelevant and immaterial. This is upon the ground that there must be identity of person. In other words, it must appear that the person on trial was in fact the person named in the manifest.

This view, as to the necessity of identity of person, was accepted by Judge Lowell to its fullest extent, and the jury was told that the evidence contained in the manifest was only addressed to the question of motive, and was of no weight or value whatever, unless they should find that the James McInerney who came to this country in 1892 was the same man as the defendant. The instructions were very full and complete upon this branch of the case.

The idea of identity necessarily involves a question in the nature of a question of fact. The evidence directed to a question of identity might be so strong as to clearly make the connection, it might be so weak as to clearly fail in that respect, and in such case the collateral fact would be excluded upon a ruling of law; but, where the relevancy and the materiality of collateral facts depend upon their being connected with the main proposition or ultimate fact, the connection may be established in the same way that any other question of fact may

be established—that is to say, by circumstantial evidence—and whenever the circumstances reasonably tend to establish a connection which would make a collateral fact material, if the connection is established, the trial judge is necessarily in a position where he must submit the question to the jury under proper instructions. Where a proposition is sought to be established by circumstantial evidence, the individual circumstances standing independently are immaterial, and, as recently pointed out in Commonwealth v. Tucker, 189 Mass. 457, 76 N. E. 127, must necessarily be admitted piecemeal, and, if the connection fails, then the individual circumstances have no value and under proper instructions will do no harm. If the circumstances so far operate as to create a reasonable question whether the collateral fact is connected, that question, like any other question of fact, must be submitted to the jury under suitable instructions; and it was upon this view that the District Court, under proper cautions, permitted the jury to consider provisionally the collateral facts contained in the manifest, under instructions that, if they should find that the person on trial was the man named in the manifest, they might consider the date of arrival in this country upon the question of motive for destroying the record of his naturalization, and upon that question only, and, if they should find he was not the man, then the manifest and all it contained was wholly immaterial.

. Therefore it only remains to inquire whether the circumstantial evidence so far tended to establish connection between the McInerney of the manifest and the McInerney on trial as to warrant submitting the question of identity of person to the jury. According to Greenleaf and Wigmore (Greenl. vol. 1, § 43a; Wigmore, § 2529, and notes) concordance in name alone is always some evidence of identity of person, but we may assume for the purposes of this case that evidence alone of identity in name is not sufficient to justify submitting to the jury the question of personal identity, and that it is necessary to have something more in the nature of evidence to warrant a verdict. Still, as already said, a question like this is, after all, more a question of fact than a question of law, and we need not refer to the numberless authorities with respect to questions of identity arising out of marriages, births, convictions of crime, estoppels, wills, and settlements of estates, and in connection with other subjects of legal controversy, further than to say that oddness of the name, size of the district where the name exists, length of time, sameness in age, nationality, birthplace, sex, occupation, marks, and similarity in features have been recognized in the various cases as circumstantial evidence of more or less weight tending to establish identity of person. In this case there was, in addition to the evidence which results from the sameness and the oddness in name, evidence tending to show that the defendant's age corresponded with the age of the McInerney named in the manifest, that the nationality and birthplace were the same, and that the defendant resides in the city or place named in the manifest as the city or place of destination. There was also evidence tending to show that the defendant has resided in Boston since about the time of the date named in the manifest. Quite independent of the idea of

presumptions which are talked about in the books as resulting from identity of name and identity of descriptions and conditions, we think the description of the defendant as to age, birthplace, nationality, time and place of arrival, and residence, so closely fitted the age, birthplace, nationality, destination, and time and place of arrival of the person described in the manifest as not only to justify, but to require the presiding judge to submit to the jury the question of identity of person.

Under the instructions given the jury may have found that the person named in the manifest and the defendant were one and the same, and may have been influenced upon the main fact by the collateral fact made relevant and material by such finding; while, on the contrary, the jury may have found that they were not the same, and may have found the defendant guilty upon the evidence directed to the main question, entirely uninfluenced by the collateral facts directed to the question of motive made quite immaterial and wholly unprejudicial by the finding that the person named in the manifest and the one on trial were not the same. In either event it would be a fair trial, and, there being substantial evidence tending to show identity of person, the question became one which could not be ruled under the law either way, and the plan adopted by the District Court was the only one reasonably permissible, and involved, perhaps, the only kind of a trial of which the case was susceptible under the circumstances.

The judgment of the District Court is affirmed.