**CHAPMAN et ux. v. UNITED STATES.**

No. 13613.

United States Court of Appeals
Fifth Circuit.
March 8, 1952.

Jack K. Ayer, Houston, Tex., for appellants.

Brian S. Odem, U. S. Atty., William R. Eckhardt, Asst. U. S. Atty., Houston Tex., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and STRUM, Circuit Judges.

HUTCHESON, Chief Judge.

Brought under the Federal Tort Claims Act[1] by his father and mother, beneficiaries of the action conferred by Art. 2315 Louisiana Civil Code, this suit was for damages for the death of their son as a result of the crash in Louisiana of a United States Air Force plane killing all on board.

The claims of negligence set out in great detail in the complaint, reduced to their essence, were three in number: (1) that the plane was defective; (2) that the pilot was inadequately briefed on the weather; and (3) that he was negligent in the handling of the plane.

The United States denied the charges of negligence and pleaded a release signed by the deceased and by his father as parent or guardian.

At the conclusion of the evidence, the district judge querying plaintiffs' counsel, "What negligence have you shown?", a full argument followed.

The district judge, filing findings of fact and conclusions of law in the form of an unreported memorandum, found no negli-

1. 28 U.S.C.A. §§ 1346(b), 2671–2680.

gence, and in addition that plaintiffs were barred by the release, and entered judgment for the defendants, and plaintiffs have appealed.

Putting forward ten specifications of error, appellants argue them here under three propositions.

These are: (1) that they have shown by practically undisputed evidence specific acts of negligence on the part of agents and employees of the United States, and that the district judge's findings to the contrary are clearly erroneous; (2) that the court erred in excluding from evidence the Army Air Force Board's report of the accident in-vestigation which sets forth the opinion of the board that the pilot just before the crash exercised poor judgment and technique; and (3) that the court erred in holding that plaintiffs were barred by the pleaded release.

Upon the first proposition, we find ourselves in agreement with the district judge that plaintiffs did not show negligence, and, therefore, in disagreement with the appellants that they did.

Because we are of the opinion that the district judge in the memorandum which, since it is not reported, we have set out sufficiently below,[2] adequately dealt with

2. "Prior to his death on September 12, 1948, Walter Kyle Chapman, Jr. was the only son of the Plaintiffs W. K. Chapman and wife. He was a young man eighteen years of age and an out-standing student at Rice Institute, this city. Young Chapman was a private in the Civil Air Patrol, a civilian volunteer organization and auxiliary of the U. S. Air Force. Members of this organization are permitted from time to time to fly as passengers in Air Force planes, and at his request young Chapman was authorized to proceed on a flight from Ellington Field, Texas to the Municipal Airport at New Orleans, Louisiana. The plane crashed and burned as it came in for a landing at its destination, resulting in the immediate death of all aboard and complete destruction of the craft.

"This is an action by the parents of young Chapman against the Government under the Tort Claims Act, alleging various acts of negligence on the part of the Air Force personnel concerned, placing particular emphasis upon their allegations of inadequate weather information having been given the pilot, inexperience on the part of the pilot, and the conduct of the pilot shortly before the crash.

"The Defendant contends that there is no sufficient showing of negligence, and relies upon a release allegedly executed both by the minor and his father, the Plaintiff here, prior to the flight, under the terms of which the Government was relieved of all liability for damages in the event of injury to or death of young Chapman.

"The plane was designated as a Type T-7 in Air Force nomenclature, being a two-engine Beechcraft. With Captain Wallace L. Page as pilot, Lieutenant Rodney J. Alsup, co-pilot, and with Chapman and three other passengers, the plane took off from Ellington Field at about 12:30 P. M. Prior to take-off, the pilot had filed his flight plan, received his briefing on the weather conditions which he might encounter, and received a Visual Flight Rules clearance to New Orleans.

"The flight was uneventful until the plane reached the area of Baton Rouge. At 2:37 P. M., by radio the pilot contacted the New Orleans station and reported that he was fifteen miles south of Baton Rouge at 2,000 feet, was encountering bad weather and overcast, and requested that his Visual Flight Rules clearance be changed to Instrument Flight Rules clearance covering the remainder of the flight. Five minutes later the New Orleans station gave this permission. At 3:11 P. M., the pilot again reported by radio that he was approximately ten miles out of New Orleans and unable to determine his position, and that his radio receiver was not operating. Immediately thereafter, the New Orleans station instructed the pilot to advise the amount of fuel aboard and whether he desired that another suitable landing field be selected where better weather conditions prevailed. This message was not acknowledged by the plane and apparently was not received. At 3:13 P. M., the pilot radioed that he had found a hole in the overcast and was descending. At 3:24 P. M., he radioed that he was at 750 feet, that one engine was not operating, that he was in emergency and would land at the first field available. On receipt of this message, the New Orleans station alerted all other fields in the vicinity, had them clear their traffic and stand by. At 3:32 P. M., the pilot reported that he was coming down the edge of Lake

and correctly disposed of this proposition adversely to appellants, we shall not write at length upon it.

We shall, however, for the purpose of bringing into precise focus the real question below and here, *whether plaintiffs satisfied*

Pontchartrain with one engine out and the remaining engine running rough. A notation attached to this message—apparently made by the New Orleans radio operator who received it—noted that the first field would probably be the Navy Auxiliary Field. At about this moment, the training officer of the Naval Air Station at New Orleans observed the plane about a mile to the west. It was flying at approximately 200 feet altitude and was proceeding in an easterly direction. This officer immediately contacted the control tower at the Navy Field, instructed the radio operator to try to contact the aircraft, and to make the field available. A green light was flashed as a signal to the plane that it might land. The plane proceeded past the Naval Air Station at a distance of approximately one-half mile without acknowledging the green light, and approached the New Orleans Airport, which is located approximately two miles beyond the Navy Field. As the plane approached the New Orleans airport, it was lined up with one of the runways, and the airport flashed a green light giving permission to land immediately. This was not acknowledged by the aircraft. The pilot instead executed a right turn, apparently for the purpose of aligning with another runway, and a green light again was directed to the aircraft, giving permission to land on this second runway. This signal was acknowledged by the plane's blinking its landing lights. The plane then attempted to execute a left turn to come into proper alignment, and began to lower its landing gear. At this point it spun into the ground, crashed, and burned.

"As to the Plaintiffs' allegation that the pilot was not adequately briefed upon the weather, and, in view of the possibility of encountering turbulence, should have been given a visual clearance only to Baton Rouge and an instrument clearance thence to New Orleans, the evidence shows that for some forty-eight hours prior to the inception of the flight, a "front" or weather disturbance had been lying practically stationary some miles in the Gulf off the Louisiana Coast. It was known that this turbulence might move inland at any time, but at the time of take-off there was no indication that such movement was imminent. While no witness who testified could state from independent recollection just what infor-

mation had been given the pilot, the evidence does indicate that he was given the benefit of all weather information then available. The pilot certified prior to take-off, "I have been adequately briefed on the current and forecast weather affecting my flight, and I understand the weather situation." Certainly there is no evidence that any information available to the weather office was withheld from the pilot or that the briefing officers were negligent.

"As to authorizing a visual clearance for the entire trip, if there be any improper judgment exercised there (which I doubt, in view of the weather information then available), the error was rectified long prior to the time that the plane experienced any difficulty, for, as stated, the pilot changed his flight plan by radio contact with ground stations at or near Baton Rouge, with the same result as though the flight plan had been issued originally in the form which Plaintiffs contend it should have been. Issuing the plan in its original form could not have been a proximate cause of the accident.

"The records of the Army Air Force received in evidence indicate that the pilot had some 800 hours experience and was qualified to fly the type aircraft involved. There is no proof whatsoever that he was known to be a reckless or unskilled flyer. I can find no negligence in permitting him to pilot the plane.

"In their argument and brief, Plaintiffs stress particularly the alleged negligence of the pilot in failing to land at the Naval Auxiliary Field, and in failing to come in directly for a landing at the New Orleans airport upon the runway with which his plane originally was aligned. The pilot's conduct in attempting to make the maneuvers which he did and in attempting to land on the other runway gives me more concern than any other allegations of negligence, but on mature consideration, I cannot and do not find that this was negligence. Under the weather conditions then prevailing, it may well have been that he did not see the green lights which originally were directed toward his plane; or for reasons to us unknown the course which he pursued may at the moment have seemed, and in, fact, been the more reasonable and intelligent plan to follow. The fact that he was aware of the danger and expected to do everything pos-

*their burden of proof,* add to the statement of the district judge the following brief statement of our own.

We think it clear, indeed it is hardly contended otherwise, that there is ample evidence from which a reasonably adequate picture of the flight from its very beginning until shortly before its sudden and fatal ending may be drawn, and that in that picture no proof of negligence appears. The last critical moments of the flight, as time and tide go in a plane which, though still airborne, is in desperate plight, must, however, remain forever shrouded behind the impenetrable curtain which death has drawn. This curtain neither investigators, nor boards, nor even judges can pierce, except by speculation and conjecture, and these may not take the place of proof. Since knowledge must precede understanding, and understanding must precede judging, and we cannot know, we cannot judge what was done by the pilot that he ought not to have done, what was left undone by him that he ought to have done, it is, *we think, fatal to plaintiffs' claim that they were unable to discharge their burden of proof by presenting evidence as to what in those critical moments was happening to* *and within the plane.* Without such evidence, the district judge could not have found the pilot negligent, in the face of the undisputed facts showing that in the pressing, the enormous emergency, the agony indeed, of those final fateful moments, his radio out, one engine gone and the other failing, he was fighting desperately to save (his plane and the lives of all within it, including his own.

■ Since we cannot know the facts, and conjecture may not serve as proof of them the *post hoc* armchair speculations of the report, if admitted in evidence, may not serve as such. Nor may we, on the basis of these forbidden substitutes for evidence, conclude that the district judge made a clear error in finding no negligence and that his judgment refusing to convict the dead pilot of wrong doing without evidence and to require the United States to stand in damages was wrong and must be reversed. Indeed, we think the evidence standing as it does, that a finding that the pilot was negligent, and the United States was liable, would do great violence to the evidence and to the law governing those who, finding themselves in the emergency of swift and dire peril, brought about by no

sible to land the plane quickly and safely is indicated from his radio messages. While in retrospect it may appear that some other course might have been more feasible, the proof before me does not show by a preponderance of the evidence any negligence on the part of the pilot.

"In support of their contention of negligence on the part of the pilot, the Plaintiffs offered in evidence the report of a Board of Air Force Officers appointed September 22, 1948, to investigate the accident and its causes. This consists of a number of documents, bound together, and constitutes a file maintained by the Directorate of Flight Safety Research. It includes an Air Force form styled "Report of Major Accident" which contains a recitation of the flight and its disasterous result, together with the conclusions of the Board of Officers as to the cause of the crash; copies of various reports maintained on the airplane for some time prior to the flight; certified copy of the release hereinafter referred to, and several unsworn statements of witnesses. Apparently this Board of Officers considered the in- formation presented in the Air Force reports and in the statements of witnesses, and as its own report reconstructed the flight and gave its opinion as to the cause thereof. In the opinion of the Board, the crash resulted from the exercise of poor judgment on the part of the pilot in not landing at the Naval Air Station or upon the runway of the New Orleans airport with which the plane originally was aligned. The Defendant objected to the introduction of this entire report on the ground that it consisted only of opinions and conclusions of the Officers of the Board, based entirely on hearsay statements and data before such Board. The Plaintiffs contend that the entire report is admissible under the terms of Section 1732 of Title 28 U.S.C.A., citing Moran v. Pittsburgh-Des Moines Steel Co., 3rd. Cir., 183 F.2d 467. While certain language in that opinion tends to support the Plaintiffs' contention, I think that Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719, and the annotation thereof at p. 727, establishes a contrary rule. For the reasons there cited, I hold the report inadmissible."

fault of their own, adjust themselves to it as best they can and fight a brave and unremitting fight to the bitter end.

 It would be difficult, we think, to find a case more demanding of the application of these controlling legal principles than this one presents. As stated and supported by full authority in 38 Am.Jur., "Negligence", Sec. 41, "Acts in Emergency or Sudden Peril", at page 686: "The prudence and propriety of an action are not to be judged by the event but by the circumstances under which it was done. The rule, as stated generally, is that one who, in a sudden emergency, acts according to his best judgment, or who, because of want of time in which to form a judgment omits to act in the most judicious manner, is not chargeable with negligence. * * * The fact that injurious consequences might have been avoided had he chosen another course of conduct does not charge him with negligence."

 Or, as the rule is stated on page 687: " * * * the sound view appears to be that one who through no fault of his own, is confronted with a sudden peril and does things which afterward may seem to have been improper or foolish is not negligent if he does what a prudent man would or might do under the circumstances."

Putting to one side, therefore, that the Board was without authority to adjudge fault, nothing in its conclusion, that the pilot did not exercise good judgment, in any way militates against this view. It was based on the same complete lack of evidence which prompted the district judge's query, in effect; who at this time and in the state of the record knows, who can say, what was good judgment then or what a prudent man, confronted as the pilot was, would do? Who can, upon this record, say what untoward and unforeseen circumstances, not revealed in the record, intervening at the last moment, wrecked the plans and the plane?

 Upon the second proposition, the exclusion of the Army Air Force Board's report, we are of the clear opinion; that nothing in the report, which the judge had before him and read, and which is before us in the record, requires or supports a different finding as to negligence from that made by him; and that its exclusion, if error, was harmless. We are of the equally clear opinion, however, that its exclusion was not error. In complete agreement with the view of the district judge, that the report was inadmissible under Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, we are of the further opinion that the decisions from the Second and Third Circuits,[3] cited and relied on by appellants, seem, in the language of our brother Chase, dissenting in Korte New York, N. H. & H. R. Co., 2 Cir., 191 F.2d 86, 92, the last but not the least of the line, "to be a rather complete disregard of what was decided in Palmer v. Hoffman * * *."

Upon the third proposition, it is sufficient to say that our affirmance of the judgment on the issue of negligence renders unnecessary its discussion and disposition.

The judgment appealed from should be, and it is,

Affirmed.

---

3. Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467; Pekelis v. Trans. & Western Air, Inc., 2 Cir., 187 F.2d 122.