**James MATTHEWS**
**v.**
**UNITED STATES of America.**
**No. 15086.**

United States Court of Appeals
Fifth Circuit.

Dec. 9, 1954.

S. B. Wallace, Griffin, Ga., for appellant.

Floyd M. Buford, Asst. U. S. Atty., Frank O. Evans, U. S. Atty., Joseph H. Davis, Asst. U. S. Atty., Macon, Ga., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

James Matthews was indicted and tried on five counts, charging, first, that he had in his possession, custody and under his control a still and distilling apparatus; second, that he carried on the business of a distiller without having given bond; third, that he carried on the business of a distiller with intent to defraud; fourth, that he worked in a distillery; and fifth, that he carried and delivered raw material, to-wit, three 55-gallon drums of kerosene to a distillery for the production of spirituous liquors. He was convicted on the first four counts, and the fifth count was nol prossed.

Defendant introduced no evidence in his own behalf. He objected to the introduction of certain documentary evidence by the government, and moved for a directed verdict of acquittal. The trial court's adverse rulings on these matters form the basis of his appeal here.

The evidence on which this conviction was based was circumstantial and it was meager. Whether it was sufficient to have authorized the court to submit the case to the jury, if it was all admissible, need not be decided, since we find that the court committed prejudicial error in admitting, over defendant's objection, the so-called "sugar reports."

The government proved that when the arresting officers raided the still in question a 1949 Dodge truck with 1953 Georgia license Number A/H11314, was about twenty yards from the distillery, backed up to 336 gallons of non-tax paid whiskey.

When appellant was arrested between 50 and 100 yards from the still site, he did not have on a hat. A hat was found five yards from the Dodge truck. Appellant's only statement at the place and time of arrest was that it was his hat.

On the 1949 Dodge truck, parked in the distillery yard, there were forty cases of one-gallon glass jugs and three 55-gallon oil drums. The distillery consisted of two 150-gallon steamers, two 220-gallon stills, one 60-gallon still, one doubler, one radiator condenser, a pressure tank, a set of gas burners, eighteen 220-gallon fermenters, and 1980 gallons of mash.

A kerosene and gasoline mixture was used in firing the illicit distillery. The radiator condenser found at the still was an automobile radiator with connections welded on to it; it was a fairly new radiator. When the illicit distillery was raided all persons there ran.

Mr. Thomas Felton Thompson, of the Buford Feed and Grain Company, 809 Bankhead Avenue, Atlanta, Georgia, testified that on August 4, 1953, he sold 3600 pounds of sugar to one James Walker, which he delivered to a vehicle bearing 1953 Georgia license number A/H 11314, this being the same license number as that on the vehicle later seen at the still. He further testified that on August 10, 1953, he sold 3600 pounds of sugar to one James Walker and delivered same to a ton and a half truck, bearing 1953 Georgia license number A/H11314. Mr. Thompson further testified that at the time of these sales, 3600 pounds of sugar cost $327.60 and that each of the three transactions was a cash sale. He testified that he was not present at the time of these two sales, but he then testified that he personally had delivered a 3600 pound order to the same truck to one James Walker on August 17th. He declared that at the time of this sale defendant was standing at the side of the truck, but that he neither did nor said anything.

The government also introduced in evidence over defendant's objection three reports made by the Buford Company to the Alcohol Tax Unit of the Internal Revenue Service showing the details of these three sales.

1. The government's proof in this case was weak and entirely circumstantial, and while there was more here than mere presence and flight, as in the case of Vick v. United States, 216 F.2d 228, decided by this Court October 29, 1954, in view of the opportunity more fully to develop the case which a new trial will furnish, we find it unnecessary to decide whether it was or was not insufficient. The trouble is that some of the evidence ought not to have gone to the jury, and the fact that it did must be held to be prejudicial error. While it is not necessary for us to speculate as to what effect the illegal evidence had on the deliberations of the jury, it is nevertheless appropriate to point out that a case in which the government has barely proved enough to sustain a verdict offers a good backdrop against which to examine the importance of adhering to rules of evidence which might otherwise annoy those who are impatient with the law's technicalities.

2. The sales slip taken from the person of the accused after arrest was not inadmissible for the reasons assigned on the trial. United States v. Heitner, 2 Cir., 149 F.2d 105. Its admissibility over objection as to relevancy, if such objection had been properly made, is doubtful. The purchases referred to on the sales slip were in no way tied into the operation of the still or of its construction; any deduction by the jury drawn from the fact that Matthews had purchased an unspecified number of drums and an automobile radiator and a shovel and a hoe would of necessity be based on pure speculation; however, appellant's counsel did not object to the admission of the sales slip on the ground of

**412**

relevancy, and this question is therefore not before us for decision.

3. As to the admission of the so-called "sugar reports" the situation is different.

The government had its witness, an Internal Revenue employee, identify three separate sheets of typewritten entries on a form entitled "Return Under Section 2811, I.R.C. (Alcohol and Tobacco Tax)". This form was printed, and carried the notation in the upper left hand corner "Form 169, U. S. Treasury Department Internal Revenue Service (Revised Oct. 1953)." The form had six columns headed respectively as follows: "Date Sold or Shipped," "Quantity (Lb., cwt., or gal.)," "Kind of Substance (Brand)," "Name and Address of Person or Firm to Whom Sold or Delivered," "Auto Tag No.; R. R. Car No.," "Driver's Name and Address; No. of Permit; Date it Expires." At the bottom of each page appeared the following language:

"This return, required by formal demand letter issued pursuant to section 2811, I.R.C. [26 U.S.C.A. § 2811], is a correct and complete report for this period of all dispositions, including sales of substances named in the demand letter."

The defendant's name did not appear anywhere on these returns. Upon their having been identified by the government's witness, counsel sought to elicit information as to their contents, particularly to show that there were three sales made to one James Walker by the Buford Feed and Grain Co. Defendant's counsel objected on several grounds, including the objection that this evidence was hearsay.[1]

The court withheld its ruling and thereupon permitted the witness to testify as to the contents of these sugar reports which had been received by him in the mail, and which were the sole basis of his testimony as to three 3600 pound sales to one James Walker.

[1]. The following colloquy took place between the court and counsel:

"Mr. Wallace:

"Now, Your Honor, we object to that on several grounds. We don't have James Walker on trial and he doesn't say that he made these records himself. He says somebody sent them to him. He's just the custodian of them. He hasn't said that he made these records up, somebody just sent them to him. That's hearsay and it's immaterial and prejudicial because it's against somebody else, James Walker; and we're not trying him today.

\* \* \* \* \* \*

"Mr. Davis:

"Your Honor please, we expect to show that these reports are submitted to the Alcohol and Tobacco Tax office by various wholesalers throughout the State as the law requires them. The regulations requires [sic] them to submit those reports concerning extraordinary sales of sugar and malt and meal and things like that; and on that they list the name of the purchaser, or the purported name of the purchaser and the license number of the vehicle to which those sales were delivered. And we expect to show by this evidence, Your Honor please, that on three different occasions that sales of sugar were made to one James Walker; and that the license number that was given as belonging to this James Walker was

the same license number on the truck that was found at the still-site, if Your Honor please.

"The Court:

"Yes, but he's not a defendant.

\* \* \* \* \* \*

"Mr. Davis:

"Let me state this in my place, if Your Honor please: We expect to show by the owner of this feed company that on one occasion listed in there that the defendant, James Matthews, was at the truck at the time the sugar was delivered to it in Atlanta; and we certainly think that after we finish our evidence that it is tied in with one of the defendants on trial, Your Honor please, is tied in with this particular truck.

\* \* \* \* \* \*

"The Court:

"Well, with the district attorney stating in his place that he is going to connect it, I will admit it; but if he doesn't do it, I will exclude it.

"Mr. Wallace:

"Do you want me to make another motion later on?

"The Court:

"Yes, at that time.

"Mr. Wallace:

"And, of course, we will want to make the motion that it is not admissible, even though he connected it." R. 28–35.

The District Attorney subsequently put Mr. Thompson on the stand and he testified as to three sales to James Walker, but stated that he was not present at two of them. He also testified that on the occasion handled by him the defendant was standing in the vicinity of the truck, but that he neither spoke nor acted in connection with the transaction, and that the man who called himself James Walker paid for the 3600 pounds of sugar.

In this posture of affairs defense counsel renewed his objection, stating: "We want to renew our objection on this." Subsequently the government tendered in evidence the three "sugar reports" and defendant's counsel again objected. The court admitted them as to the defendant Matthews and not as to the other defendants in the case.

4. The relevancy of the sugar reports and the testimony as to sales to Walker may have been established satisfactorily in view of the association of the defendant with the truck at the two separate places; i. e. in Chamblee at the Buford Feed and Grain Co., and later at the site of the still. But there can be no justification for the admission of the oral testimony from the reports and of the reports themselves over the objection that they were hearsay.

The only basis for arguing for the admissibility of these reports as an exception to the rule prohibiting the admission of hearsay evidence would be that it is within the exception that finds expression in § 1732, Title 28, U.S.C., sometimes known as the Federal Business Records Act [2] or the one that is contained in § 1733,[2] which we shall refer to as the official records statute.

That the oral testimony and reports were hearsay—extra judicial testimonial assertions that certain sales of sugar were made—is apparent. The first question is whether the Federal Business Records Act, expressing an exception to the hearsay rule, is broad enough to include these reports.

The record discloses the true nature of these reports. They were required to be made by certain dealers in sugar, malt, yeast and other articles normally used in the manufacture of alcoholic beverages, 26 U.S.C. § 2811. It then becomes necessary to determine whether these reports were "made in regular course of any business."

Certainly these reports were not made by the Buford Feed and Grain Co. in furtherance of its business in the buying and selling of merchandise. If they were, then it may be conceded that a construction of the Federal statute making them admissible is not an unwarranted extension of the old and familiar shopbook or book-of-account exception to the hearsay rule. So long as the accuracy and reliability of records sought to be introduced in evidence have been tested by the fact that a business concern carries on its own affairs from day to day

---

2. § 1732. Record made in regular course of business.

"In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

§ 1733. Government records and papers; copies.

"(a) Books or records of account or minutes of proceedings of any department or agency of the United States shall be admissible to prove the act, transaction or occurrence as a memorandum of which the same were made or kept.

"(b) * * *"

in reliance upon such records, there is no departure from the standards of accuracy and trustworthiness that were basic in the historic rule permitting testimony from the shop book or book of account.

Where, as here, one party seeks to prove a substantive fact by the introduction in evidence of a report that is compiled, not in connection with the Buford Company's own operation, but at the behest of the Director of Internal Revenue under sanction of a Federal statute, none of the proofs of trustworthiness, such as reliance by the public on the record or the use of the record as an integral part of the business in its own interest, is present.

The Supreme Court passed upon the scope of the Federal Business Records Act, 28 U.S.C. § 1732, in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 479, 87 L.Ed. 645, 144 A.L.R. 719. A quotation from that opinion shows that the Court, in holding that an accident report made out by an employee of defendant railroad in accordance with company rules was inadmissible under the statute, construed the words "in the regular course of business" to exclude that part of a business which is primarily concerned with litigation and the like and only indirectly with the main activity of the business. 318 U.S. 109, 111–113, 63 S.Ct. 479:

"We may assume that if the statement was made 'in the regular course' of business, it would satisfy the other provisions of the Act. But we do not think that it was made 'in the regular course' of business within the meaning of the Act. The business of the petitioners is the railroad business. That business like other enterprises entails the keeping of numerous books and records essential to its conduct or useful in its efficient operation. Though such books were considered reliable and trustworthy for major decisions in the industrial and business world, their use in litigation was greatly circumscribed or hedged about by the hearsay rule—restrictions which greatly increased the time and cost of making the proof where those who made the records were numerous. * * * It was that problem which started the movement towards adoption of legislation embodying the principles of the present Act. * * * And the legislative history of the Act indicates the same purpose.

"The engineer's statement which was held inadmissible in this case falls into quite a different category. It is not a record made for the systematic conduct of the business as a business. An accident report may affect that business in the sense that it affords information on which the management may act. It is not, however, typical of entries made systematically or as a matter of routine to record events or occurrences, to reflect transactions with others, or to provide internal controls. The conduct of a business commonly entails the payment of tort claims incurred by the negligence of its employees. But the fact that a company makes a business out of recording its employees' versions of their accidents does not put those statements in the class of records made 'in the regular course' of the business within the meaning of the Act. If it did, then any law office in the land could follow the same course, since business as defined in the Act includes the professions. We would then have a real perversion of a rule designed to facilitate admission of records which experience has shown to be quite trustworthy."

This Circuit has had one previous occasion to construe this statute. In Chapman v. United States, 194 F.2d 974, certiorari denied 344 U.S. 821, 73 S.Ct. 19, 97 L.Ed. 639, we held that exclusion of an Air Force board report concerning an aircraft crash was not error, and said, 194 F.2d 974, 978:

"In complete agreement with the view of the district judge, that the

report was inadmissible under Palmer v. Hoffman * * * we are of the further opinion that the decisions from the Second and Third Circuits [Footnote: Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467; Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, 23 A.L.R.2d 1349], cited and relied on by appellants, seem, in the language of our brother Chase, dissenting in Korte v. New York, N. H., & H. R. Co., 2 Cir., 191 F.2d 86, 92, the last but not the least of the line 'to be a rather complete disregard of what was decided in Palmer v. Hoffman * * *.' "

We are still of the opinion that Palmer v. Hoffman is a precedent binding upon this court, that it correctly construes 28 U.S.C. § 1732, and that its authority has not been impaired by denial of certiorari in the Pekelis and Korte cases.[3] And we think that, like those cases, United States v. Grayson, 2 Cir., 166 F.2d 863, 870, which resembles in some respect the case at bar, although the hearsay objection was not there raised, construes Section 1732 incorrectly.

In the Grayson case two types of evidence were tendered. In the one instance, the trial court admitted as official records certain "offering sheets." The Court of Appeals held this was error, and this holding will be discussed below in our consideration of the official records exception to the hearsay rule. In the other instance the trial court excluded certain "sales reports," which were filed by registered dealers in oil royalties under a requirement of the Securities & Exchange Commission (so far as appears the particular reports were not filed by anybody connected with the accused Grayson). The admission of these reports was objected to on two grounds: (1) They were too remote to be material, and (2) They were privileged because of regulations of the Commission. No objection was made on the ground that they were hearsay. The court rejected the contentions that were made and observed "they were competent as to the sales price, because, unlike the 'Offering Sheets,' the price was a matter within the knowledge of the dealers and they were made in the regular course of their business." The court did not discuss the question that is here so important—whether the fact that the reports were required by law to be filed of itself caused the court to find that they were made in the regular course of business. The court was concerned with the grounds for rejecting the evidence that had been urged on the trial court and its statement that the reports were made in the regular course of business was made without further elaboration or explanation. We do not feel therefore that the Grayson case should be considered as authority for the proposition that reports made to government agencies under the sanction of statutory requirements or appropriate regulations are by that fact admissible in evidence as an exception to the hearsay rule by virtue of the provisions of Section 1732.

We have next to consider whether these reports come within the exception to the hearsay rule under Section 1733. It is difficult to construe the language of this section to cover reports made by non-official persons to comply with statutory or other legal governmental requirements. However, the statute has been construed to cover some such documents by some Federal courts.

On the other hand, there are two Federal cases squarely holding such reports non-admissible where the duty to submit the reports is merely enforceable by a penal statute. The first of these cases is U. S. v. Elder, D.C., 232 F. 267. In that case it was held that monthly returns kept by an oleomargarine dealer and required by internal revenue regulations were not admissible as official rec-

---

3. Pekelis v. Transcontinental & Western Air, Inc., 2 Cir., 187 F.2d 122, 23 A.L.R. 2d 1349, certiorari denied 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374; Korte v. New York, N. H. & H. R. Co., 2 Cir., 191 F.2d 86, certiorari denied 342 U.S. 868, 72 S.Ct. 108, 96 L.Ed. 652. See Note, 37 Cornell L.Q. 290.

ords in a prosecution of a customer of such dealer charged with violating the oleomargarine law. This case is cited by Wigmore who says the case "seems correct." 5 Wigmore, Evidence, 1633(a). The case, however, has never been cited in any other opinion. Wigmore comments as to one reason why the case has not been cited more frequently:

"Most such reports, required by statute, are privileged in one way or another; hence the present question does not often arise."

The second case in which a Court of Appeals held the mere requirement that reports be furnished did not authorize their admission under the official records statute, is United States v. Grayson, supra. As mentioned above, the trial court in that case admitted certain records called "offering sheets" as official documents. The court there says:

"Official in one sense of course they were, for the dealers had filed them in obedience to a regulation of the Securities & Exchange Commission; but not all documents required to be filed by law are competent evidence of all that they record. The exception is confined to transactions of which it is not only the duty of an official to make entry, but which must themselves have come within his knowledge in the course of his duties."

It is clear that there was no such limitation on the admissibility of records under Section 1733. In holding, therefore, that the admission of the "offering sheets" in the Grayson case was error, it is clear that the court decided that such documents were not official records within the purview of Section 1733.

Among the cases holding that reports submitted pursuant to statutory requirements are admissible as official records, are Sternberg Dredging Co. v. Moran Towing & Transport Co., 2 Cir., 196 F. 2d 1002; McInerney v. United States, 1 Cir., 143 F. 729; Sullivan v. United States, 1 Cir., 161 F. 253.

In Sternberg Dredging Co. v. Moran Towing & Transport Co., supra, in which the Court of Appeals for the 2nd Circuit most recently made such a holding, the Court found that a written report of occurrences at the time of an accident made by the master of a tug pursuant to Coast Guard regulations was admissible as an official record. In its opinion the Court stated that there was nothing inconsistent with the Grayson decision, supra, because the Court said the report "contained nothing but what its author had himself witnessed." [196 F.2d 1005.]

As we view it, there is an important distinction between cases like Sternberg, McInerney and Sullivan, supra, on the one hand, and Elder and Grayson, supra, on the other. This distinction can be seen from the fact that in each of the cases in which the courts have held the report amounts to an official act, the person acting had a public duty beyond that placed upon him by the requirement of the statute. In each of those cases the actor was a ship's captain. The court's opinion in the McInerney case, supra, points up this important fact:

"It would seem to be settled upon authority that a manifest, or a report, like the one in question, made by a designated officer under the positive requirements of a statute regulating the manner in which such officer shall discharge a quasi public duty, delivered to a proper officer of the government which confers the authority and imposes the duty, and produced by a proper custodian from the proper government office, so far partakes of the character of a public document as to become evidence of the facts which it contains and which it is by law required to set out." 143 F. 729, 736–738.

Wigmore's statement of the controlling principle is as follows:

"Can it be said that a private person, expressly required to make a record or certificate, makes it under an official duty? Or, is it to be said that the term 'official' duty is too

narrow, and that the principle includes in effect all documents made under *any duty created by law?*

"It would seem at first that the latter mode of statement cannot be justified; * * * the sanction does involve at least the idea of duty as created by official status, and not merely the idea of duty in the limited and imperfect sense of amenability to a penalty imposed by law * * *.

"In short, a person may (so far as legal theory is concerned) be an officer for the purpose of doing a single specific class of acts, and may apart from this be merely a private person. It is therefore proper enough, where by statute such a specific and narrow duty has been created, to regard the statements made under it as statements under an official duty within the notion of the present exception."·

The principle may be understood more easily from the recent text (March, 1954) of the American Law Institute, Basic Problems of Evidence.[4]

■ In accordance with the authorities cited above and because of the principles enunciated with respect to both Sections 1732 and 1733 then, we must hold that admission of the reports over defendant's objection was error; and yet our holding is supported not merely by these precedents but also by the absence here of the rational justification which obtains in every recognized exception to the hearsay rule; that is, a circumstantial probability of trustworthiness, and a necessity for the evidence. These reports of sugar sales are of course valuable as clues to tax investigators. However, the necessity or convenience of introducing them as evidence is not apparently greater than the convenience of admitting any hearsay. Lacking the necessary elements of necessity and circumstantial assurances of trustworthiness essential to the regular entries admissible at common law,[5] these reports are not "records which experi-

**4.** "3. *Ad hoc Officials.* Statutes frequently confer upon qualified persons authority to perform designated functions and forbid performance of them by others. Each of these authorized persons is required to make and file in a designated public office a written report setting forth specified matters concerning his performance of these functions and the persons or things connected therewith. In acting pursuant to statute he serves the purpose of a public officer or his deputy, and is sometimes said to be an *ad hoc* official. His written report carries the same indicia of reliability as that of a public officer and is admissible in evidence under the same conditions."
See also the somewhat more extensive treatment in the American Law Institute's Model Code of Evidence, Rule 516, which purports to restate the common law except that it would permit admission of conclusions of fact in official records, which most jurisdictions do not permit:
"Rule 516. Written statements by persons required to report authorized acts.
"Subject to Rule 519 [Discretion of judge to exclude in certain circumstances], evidence of a writing made as a record, report or memorandum of facts and conclusions concerning an act, event or condition, unless specifically privileged from disclosure by a statute requiring it to be made, is admissible as tending to prove the truth of each matter stated therein in compliance with statutory requirements if the judge finds that
"(a) the maker of the writing was duly authorized pursuant to statute to perform designated functions performance of which by persons not so authorized as forbidden by statute, and was required by statute to file a written report in a designated place or office setting forth specified matters relating to the performance of those functions and the persons or things connected therewith, and
"(b) the writing was made and filed by him as a report so required by the statute.
"*Comment*
"This rule deals with records made by persons who are sometimes said to be *ad hoc* public officials, such as physicians, undertakers and ministers of the gospel, but it is not confined to them. It is applied to those whose business or profession requires action in matters usually made the subject of vital statistics and health regulations, and who are under a duty to make and file reports of specified acts, events or conditions. * * *"

**5.** 5 Wigmore, Evidence §§ 1420, 1521, 1522.

ence has shown to be quite trustworthy," Palmer v. Hoffman, 318 U.S. 109, 63 S. Ct. 477, 480, 87 L.Ed. 645, 144 A.L.R. 719, and consequently there is no sufficient rational basis to except them from the hearsay rule.

 The question may well be posed, whether admission of these reports, even if permitted under a literal construction of Section 1732 or Section 1733, might not be contrary to the right of accused persons to confrontation of witnesses. U. S. Constitution, Amendment VI. It has been uniformly held that that right may not be invoked to exclude evidence otherwise admissible under well established exceptions to the hearsay rule, and undoubtedly Wigmore is correct in saying, with respect to the Constitutional right to confrontation, 5 Wigmore, Evidence § 1397:

"The rule sanctioned by the Constitution is the Hearsay rule as to cross-examination, with all the exceptions that may legitimately be found, developed, or created therein."

But, if Congress attempted to create new exceptions to the hearsay rule which were contrary to the sound principles underlying that rule, the very principles which must have been contemplated by the drafters of the Sixth Amendment, could we properly say these were "legitimately created" or that they did not violate the Constitutional right of confrontation in criminal cases? We think not. While the Sixth Amendment does not prevent creation of new exceptions to the hearsay rule based upon real necessity and adequate guarantees of trustworthiness, it does embody those requirements as essential to all exceptions to the rule, present or future. To hold otherwise would be to hold that Congress could abolish the right of confrontation by making unlimited exceptions to the hearsay rule.

The judgment appealed from is reversed and the cause remanded for further proceedings not inconsistent with this opinion.