**H. B. ZACHRY COMPANY, Plaintiff,**

v.

**The TRAVELERS INDEMNITY COMPA-NY, and Miles & Sons Trucking Service, Inc., and Sierra Construction Company, Inc., a Joint Venture or Partnership under the name of Miles-Sierra, Defendants.**

**UNITED STATES for the Use of MILES & SONS TRUCKING SERVICE, INC., a corporation, and Sierra Construction Company, Inc., a corporation, a Joint Venture doing business under the name of Miles-Sierra, General Contractors, Third-Party Plaintiffs,**

v.

**H. B. ZACHRY COMPANY, a corporation, and Standard Accident Insurance Company, a corporation, Third-Party Defendants.**

**Civ. A. No. 2137.**

United States District Court
N. D. Texas,
Abilene Division.

Dec. 8, 1966.

Stanley P. Wilson, Abilene, Tex., Sidney Callender, Chester Johnson, San Antonio, Tex., for plaintiff.

Josh H. Groce, San Antonio, Tex., Gordon Johnson, San Francisco, Cal., for defendants.

## OPINION

BREWSTER, District Judge.

This suit was brought under the Miller Act for damages for alleged breach of contract in connection with the construction of the Twin Buttes Dam in Tom Green County, Texas, for the Bureau of Reclamation of the Department of Interior.

H. B. Zachry Company, herein called "Zachry", the prime contractor on the project, sues Miles-Sierra, General Contractors, a joint venture composed of Miles & Sons Trucking Service, Inc., and Sierra Construction Company, Inc., and the Travelers Indemnity Company, herein called "Travelers". Miles-Sierra was the subcontractor to do the riprap work for Zachry in connection with the construction of the dam, and Travelers was the surety on the performance and pay-

ment bonds for Miles-Sierra. Zachry sought damages in excess of $1,000,000.-00 for failure of Miles-Sierra to complete its work under the subcontract.

A cross-claim and third-party complaint sought damages for Miles-Sierra from Zachry and Standard Accident Insurance Company, herein called "Standard", the surety on the payment bond under the prime contract, for the alleged unlawful and wrongful taking over by Zachry of the work subcontracted to Miles-Sierra. The amount of damages claimed was $373,327.03, representing the difference between what Miles-Sierra spent on the subcontract work and the amount it had been paid by Zachry.

Each one of the parties is a private corporation chartered by a state other than Texas, with a permit to do business in Texas. Zachry is the only one which has its main office and place of business in this State.

By agreement of the parties, the liability issues on both claims were severed from those on damages for separate and preliminary trial, as provided for in Rule 42(b), F.R.Civ.P. However, the Court's determination that there is no liability either on the plaintiff's action or on the third-party action and cross-claim makes all issues of damages moot and finally disposes of the entire case.

While the volume of evidence and nature of the case necessarily require that this opinion be somewhat lengthy, every effort has been made to condense the facts and the discussion of the issues where possible. The typewritten record of the testimony comprises about 1400 pages. There are over 100 exhibits, most of which are documentary in nature. Some of them are voluminous contracts with material, highly technical specifications. The trial briefs for each side filed since the record was written up exceed 175 pages. The case has been well tried by all counsel, and their highly competent briefs have been of material help.

All matters stipulated or admitted, as well as all those established conclusively by the evidence are found as facts, whether formally included herein or not; and they have been considered by the Court. However, where credibility of a witness is involved, no matter is found as a fact even though it is undisputed, if it does not support the findings and conclusions set out herein.

■ Each side made numerous objections to the admission of evidence during the trial. Since there was no jury, the Court followed the generally accepted practice of conditionally overruling most of the objections so that they could be considered and passed upon after all the evidence was concluded. Though such re-examination has been made, it would unduly lengthen this opinion to comment now on the final conclusion reached as to each objection. However, the Sweet Report, offered as P.Ex. 64, is of such importance that record will be made of the fact that the Court's final opinion was that the portions of the report objected to were inadmissible, and of the further fact that they were not considered for any purpose. The report was of an investigation made by R. W. Sweet, a Washington representative of the Bureau of Reclamation, in carrying out "a special assignment concerning the production and placement of riprap for the Twin Buttes Dam." The investigation was made on September 3, 1961 and shortly thereafter. The report, prepared on the following September 11th, contained information and conclusions narrated to Sweet by persons purporting to have knowledge about the subject matter of the investigation, and Sweet's own conclusions based thereon. The effect of the report was that Miles-Sierra was not qualified or equipped to do the riprap work called for by the subcontract. Zachry claimed that the entire report was admissible under the official records statute. In briefs filed since the conclusion of the evidence, Zachry relies primarily upon Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467 (1950), and Bisno v. United States, 9 Cir., 299 F.2d 711 (1961), as support for the admissibility of the report. Bisno is not in point and Moran has been

expressly rejected by the Fifth Circuit in Chapman v. United States, 194 F.2d 974 (1952), and Matthews v. United States, 217 F.2d 409, 50 A.L.R.2d 1187 (1954). Investigative reports lack the reliability of routine clerical records kept in the regular course of business, and are not usually admissible as original evidence under the business or official records statutes, as they have been construed in Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645, 144 A.L.R. 719; Gordon v. Robinson, 3 Cir., 210 F.2d 192, 196 (1954); Olender v. United States, 9 Cir., 210 F.2d 795 (1954); Hartzog v. United States, 4 Cir., 217 F.2d 706, 709 (1954); Standard Oil Co. of Cal. v. Moore, 9 Cir., 251 F.2d 188, 214 (1957); Missouri Pacific R. R. Co. v. Austin, 5 Cir., 292 F.2d 415, 422 (1961). The Court has therefore sustained the objections to and excluded the following portions of the report:

(a) That part of the first full paragraph on page 2 commencing with the words "I understand" in the sixth line of the paragraph and running through to the end of the paragraph, the last line of which reads "date was July 11, 1961."

(b) That portion of the last paragraph on page 2 commencing with the words "such an agreement" in the 11th line of said paragraph and running through to the end of the paragraph at the bottom of the page, the last line thereof reading "for both Miles-Sierra and Zachry."

(c) That part of the report commencing with the phrase "In discussing the results" on the 7th line of the only full paragraph on page 2 and continuing through to the end of the report on page 5.

Zachry claims that due to lack of qualified personnel, suitable equipment and diligent operation, Miles-Sierra failed to comply with its express obligation under the subcontract to schedule its operations as required by Zachry and to complete the riprap work in accordance with the program of allied operations of Zachry and its other subcontractors, and that as a result thereof, Miles-Sierra completed the placement of less than one-half of one per cent of the total amount of riprap at the expiration of one-third of the performance time allowed by the prime contract for the entire dam project. Zachry says that no improvement in the riprap work was made by Miles-Sierra after numerous complaints by the Bureau of Reclamation and by Zachry itself, over a considerable period of time, and that it finally gave the five day notice provided for in the subcontract demanding compliance by the subcontractor, all to no avail. Zachry contends that it was forced to take over and complete the riprap work to avoid the risk of the $1200.00 penalty for each day of delayed completion of the project beyond the 1200 calendar days allowed by the prime contract. It rests its authority for such action on the provision of the subcontract giving the contractor the right to take over and complete the work provided for in such contract, at the cost and expense of the subcontractor, in the event of default by the subcontractor or in the event its work should interfere with or in any way impede the allied operations on the project.

Miles-Sierra denies Zachry's contentions that it was lacking in qualified personnel, equipment and diligence. It insists that it understood that the embackment would be built in five foot lifts so that it could place the riprap by dumping it over the sides from back-end dump trucks, and that instead of building the dam in that manner Zachry prepared some of it in forty foot heights, thereby requiring placement of riprap by cranes instead of dump trucks.

Miles-Sierra claims that the subcontract required it to exercise an option as to whether it would procure the riprap material from Site 1 or Site 2, which were general areas designated on maps attached to the subcontract and the prime contract; that the only tract in Site 1 on which Zachry had a lease at the time of the execution of the subcontract permitting the quarrying of riprap material was one composed of 15 acres along a limestone ridge on property owned by Doc Willeke; that it elected to get the

riprap material from that 15 acre tract, and it was thereby confined thereto for the source of its material for the job; that the subcontract contained a provision guaranteeing that the material in either Site 1 or Site 2 would meet the required specifications and be sufficient in quantity to make performance of the subcontract possible; and that there was not sufficient material on the 15 acre lease having a specific gravity greater than 2.45, as required by the prime contract, to furnish the approximately 750,-000 cubic yards necessary to riprap the Twin Buttes Dam.

Miles-Sierra also claims that it was never behind Zachry's operations; that if there was any delay, it was due to unexpected trouble with the quarrying due to the claimed defective material on the 15 acre lease, to inclement weather, to lack of preparation of the necessary riprap bedding by Zachry, and to riprap work done under another subcontract with Zachry on a relocated Santa Fe railroad track that was made necessary by the fact that some of the then existing track would be in the reservoir.

In rebuttal, Zachry says that Miles-Sierra was not confined to the 15 acre tract for the source of its riprap material; that in adequate time after the execution of the subcontract Zachry leased approximately 204.5 additional acres from Doc Willeke adjoining the original 15 acre leased tract, and made it available to Miles-Sierra; that Miles-Sierra actually did substantial quarrying from land beyond the 15 acre lease which was later included in the 204.5 acre lease; that the contract does not support the construction now put on it by Miles-Sierra, but on the contrary contemplated that Miles-Sierra could at any time quarry from any land on which Zachry could furnish a proper lease in either Site 1 or Site 2, regardless of which one it quarried first; that Zachry did also have available a quarry lease on a 100 acre tract in Site 2; that after Zachry took over the completion of the riprap job, it did procure enough material from the 15 acres and the 204.5 acres covered by its

leases in Site 1 to do the riprap work, and that such material was accepted by the Bureau of Reclamation.

Zachry also insists that there is no factual basis for Miles-Sierra's claims as to the reason for its delay, and insists that Miles-Sierra's progress and quality of work were a constant source of trouble and highly unsatisfactory both to the government and to Zachry from the early part of 1961 until Zachry took over in July of that year.

■■ The contentions of Miles-Sierra based upon its version as to the discussions relative to an option as between Sites 1 and 2, and to building the dam embankment in five foot lifts can be eliminated at the outset. There was no conversation about the 15 acre tract that justified Miles-Sierra in believing that it would be limited to that tract, or that it could expect to get all its riprap material from it. There was some suggestion by Miles-Sierra to Zachry during the progress of the negotiations about building the dam in five foot lifts and using semi-truck end-dump methods in placing the riprap on the dam slope, but Zachry never agreed to it and nothing to that effect was carried forward into the subcontract later executed. However, even if the discussions as to either or both of the above matters had happened as claimed by Miles-Sierra, they would have been merely part of the negotiations that culminated in the execution of the subcontract. It was written, complete and unambiguous. Under such circumstances, all prior negotiations were merged into the contract, and its meaning is required to be determined as a matter of law from the writing itself without aid from evidence of attending circumstances. Anderson & Kerr Drilling Co. v. Bruhlmeyer, 134 Tex. 574, 136 S.W.2d 800, 127 A. L.R. 1217 (1940); Russ Mitchell, Inc. v. Houston Pipe Line Co., Tex.Civ.App., 219 S.W.2d 109, 114 (1949), err. ref. n. r. e.; Ross & Sensibaugh v. McLelland, Tex. Civ.App., 262 S.W.2d 205, 209 (1953); err. ref. n. r. e.; Beeson v. Marshall, Tex. Civ.App., 353 S.W.2d 234 (1962), err. ref. n. r. e.; Davis v. Andrews, Tex.Civ.

App., 361 S.W.2d 419 (1962), err. ref. n. r. e.

The Court's conclusion that judgment should be entered denying a recovery by Zachry on its action and by Miles-Sierra on its third-party action and cross-claim is predicated upon the following grounds:

(1) In June, 1961, Miles-Sierra was called upon to proceed to complete its obligation under the subcontract with marginal riprap material, some of which did not comply with the prime contract specific gravity requirement of "Greater than 2.45", without any written change order from the government contracting officer.

(2) Miles-Sierra was never in position to carry out the subcontract and breached it for failure to do its work diligently and properly. It did not have the personnel or equipment to do a job of this type and magnitude. It was qualified and equipped to do riprap work only on small projects where the material could be placed by semi-truck back-end dumping on embankment slopes around five feet or less. Miles-Sierra realized long before July, 1961 that it could not do the job, and was glad to be relieved from the obligations of the subcontract. It hung on only for the purpose of making Zachry run it off, hoping that it would thereby be relieved from any liability for damages.

The Twin Buttes Dam is located about nine miles from San Angelo, Texas. It forms a large reservoir by impounding the waters of the Middle and the South Concho Rivers and Spring Creek. The project covered by the prime contract contemplated a dam embankment eight miles long at the crest, with a maximum height of approximately 130 feet above the bed of the Middle Concho River. The following general description of the project is given in paragraph 13 of the Special Conditions of the prime contract: "The principal features involved in the construction of Twin Buttes Dam are an earth-fill dam embankment, equalizing channel, spillway, outlet works, connecting and service roads, and the reloca-

tion of a portion of the Knickerbocker road."

To prevent erosion, it was necessary to riprap the portion of the upstream surface of the dam that might possibly be subjected to wave action. That purpose could be accomplished only if rocks of proper size and specific gravity were properly placed on the slope so as to form a protective blanket. While small fragments of rock, called "fines", could be used to fill the interstices between large rocks placed closely together, it is readily apparent that wave action would move the fines and expose the dirt surface if the large rocks were spaced too far apart.

There were twenty-two bidders on the Twin Buttes Dam Project. After the bids were opened on March 17, 1960, Zachry was awarded the general construction contract at an over-all price of $11,836,428.00. The contract between Zachry and the Bureau of Reclamation was executed on April 1, 1960, and notice to the contractor to proceed was issued on April 7, 1960. Zachry had 1200 days from that time to complete the project, so final completion was due July 25, 1963. The contract provided for liquidated damages of $1200.00 per day for each day final completion was delayed beyond that time. The contract provided that the contracting officer designated by the Bureau, and his authorized representatives on the jobsite, were charged with the interpretation and enforcement of the contract. It further provided that changes in the terms and specifications of the contract could be made only by a written change order issued by the authorized representative of the Bureau.

The Chief Engineer of the Bureau was designated as contracting officer for the project, and his authorized representative on the jobsite was G. Raymond Rolin, the Project Construction Engineer. As a part of his official duties, the Project Construction Engineer kept records as the work progressed reflecting current conditions, progress of the work, and results of all tests. Such documents

were official records of the Bureau. They were correctly kept, and accurately reflected the weather conditions during the progress of the project.

Zachry furnished payment and performance bonds, as required by the contract, with Standard as surety on each one.

The prime contract set out in great detail the specifications for the riprap material and the manner it was to be placed on the dam slope. Some of the requirements material to this case were that the rock was to come from areas designated on attached maps as Sites 1, 2 or 8, and that its specific gravity had to be greater than 2.45.[1]

1. Zachry contends that the specification requirement of "greater than 2.45 specific gravity" related only to the samples of rock actually tested rather than to all rock which was placed on the dam. The Court does not agree with Zachry's contention. The last sentence of subdivision (e) of paragraph 55 of the specifications dealing with materials for riprap shows that it was contemplated that the quality of the material would be "determined by tests and/or inspection at the quarries and dam site." The purpose of the specifications dealing with riprap material was to insure that the rock that actually went into the riprap blanket met certain minimum standards. Zachry's construction would make the quality of rock on the dam embankment purely academic as long as the samples furnished the Bureau met the specifications. Paragraph 55 mentioned above is here quoted in full:

55. *Materials for riprap.* (a) General.—Limestone rock fragments of the quality and gradations specified herein shall be furnished by the contractor for riprap to be placed and stock-piled under these specifications.

(b) Quality.—The limestone rock fragments shall meet the following requirements as to quality:

(1) Individual rock fragments shall be dense, sound, and resistant to abrasion and shall be free from cracks, seams, and other defects that would tend to increase unduly their destruction by water.

(2) Samples prepared in accordance with applicable designations of the Bureau of Reclamation Concrete Manual, sixth edition, shall meet the following requirements when tested by the procedures described in the respective designations.

| Test | Designation | Requirements |
|---|---|---|
| Specific gravity (saturated surface dry basis) | 10 | Greater than 2.45 |
| Soundness (sodium-sulphate method) | 19 | Less than 50 percent loss of weight after 5 cycles |
| Abrasion (using Los Angeles machine grading A) | 21 | Less than 55 percent loss of weight after 500 revolutions |

(c) Gradation.—Riprap shall be reasonably well-graded in size or volume within the following limits:

| Nominal thickness of riprap inches | Gradation; percentage by weight | | | |
|---|---|---|---|---|
| | Size of rock fragments | | | |
| | ½ cu. yd. to 1 cu. yd. | ½ cu. ft. to ½ cu. yd. | less than ½ cu. ft. | sand and rock dust |
| 24 | | More than 75 | Less than 25 | Less than 5 |
| 36 | More than 25 | 45 to 75 | Less than 25 | Less than 5 |

(d) Sources.—Riprap may be obtained from any approved limestone source. Samples of cemented gravel and of sandstone from rock source site No. 7 and rock source site No. 10 shown on Drawing No. 1 (825–D–5) have been tested

by the Bureau of Reclamation and these materials will not be acceptable. Samples of limestone from the following locations shown on Drawing No. 1 (825–D–5) have been tested by the Bureau of Reclamation and some samples have met the quality requirements specified above:

(1) Rock source site No. 1.

(2) Rock source site No. 2.

(3) Rock source site No. 8.

Bidders and the contractor are cautioned that the above-mentioned deposits are variable in quality, and the sizes and quantity of acceptable riprap which may be obtained from any source is unknown. The contractor shall make all arrangements with property owners for right-of-way and pay all costs including any royalties for procuring limestone rock materials of approved quality and gradation from the above listed sources or any other approved sources.

(e) Sampling and testing.—The contractor shall furnish to the contracting officer at the dam site, without cost to the Government, such samples or rock materials for testing as may be required by the contracting officer from proposed quarry sites and from rock materials delivered to the dam site. The Government reserves the right to make inspections of the quarry sites and of the quarries. The approval by the contracting officer of some material from a particular quarry site or quarry shall not be construed as constituting the approval of all material taken from that quarry, and the contractor will be held responsible for the specified quality and gradation of rock materials delivered to the dam site. All rock materials not meeting the requirements of these specifications, as determined by tests and/or inspection at the quarries and dam site, will be rejected and any rejected materials at the dam site shall be disposed of in an approved manner at the expense of and by the contractor.

———◆———

The first meeting between representatives of Miles-Sierra and Zachry in connection with the Twin Buttes Dam Project was on March 16, 1960, the day before the general bids were to be opened. Miles-Sierra had done some subcontract earth work for Zachry on other jobs, and their relations had been satisfactory. When Zachry invited Miles-Sierra to bid on items on the project in which it might be interested, Miles-Sierra sent its representatives, George E. Stout and Harold Buttles, to San Angelo to look into the project. Buttles had procured a copy of the plans and specifications from the Bureau of Reclamation and studied them before he left California for San Angelo. While in San Angelo, he met with Warren Coker, Zachry's representative. Miles-Sierra was interested in the excavation and dirt moving phases of the project, and had no idea then of bidding on the riprap work. Coker discussed the riprap job with Buttles, and told him that Zachry already had the 15 acre lease from Willeke in Site 1 and the 100 acre lease from Sharp in Site 2. Stout and Buttles inspected the sites before they returned to California to consider bidding. About one week later, Miles-Sierra submitted Zachry written bids on several phases of work on Twin Buttes Dam, including the riprap work. The bids were not acceptable, but negotiations continued with Buttles acting for Miles-Sierra and H. S. Kerr and Mr. Cloud for Zachry. After considerable horse trading back and forth, and changing of provisions in drafts of proposed contracts between Miles-Sierra and Zachry, they did execute the subcontract for the 750,000 cubic yards of riprap work in question under date of May 20, 1960, for approximately $1,200,000.00; and Miles-Sierra furnished the bond required by the subcontract with Travelers as surety.

The following provisions in the subcontract are material to the questions involved in this case:

"SUBCONTRACT: SUBCONTRACTOR agrees to furnish all materials, equipment and labor and perform all work described herein, all in accordance with the terms, conditions and specifications of the GENERAL CON-

TRACT, such work being more specifically described as follows:

"Process, load, haul and place Riprap, approximately 750,000 C.Y., in strict accordance with contract plans and specifications, particularly Para. 67—Riprap.

"Subcontractor is to secure stone from Contractor's leases at Sites 1 or 2 and is to comply fully with all requirements of leases between Contractor and property owner covering said locations where riprap stone is secured.

"Subcontractor to construct all haul roads necessary in his operations. Temporary river crossings at three locations will be built by Contractor and may be used by Subcontractor. Contractor shall place all bedding material to receive riprap. Any bedding material damaged by Subcontractor's operations shall be replaced or corrected at Subcontractor's expense. Schedule and rate of production of riprap operations will be as required by Contractor.

"Contractor guarantees that material in either Site 1 or 2 will meet specifications and in sufficient quantity to complete required yardage in the pit selected by Subcontractor."

\* \* \* \* \* \*

"\* \* \* Should the SUBCONTRACTOR, at any time, fail in the performance of the terms, stipulations and agreements contained in this Agreement, or fail to use due diligence in the performance of the work hereunder, so as to interfere with or in anywise impede allied operations of the CONTRACTOR and other subcontractors, if any, then, in such event, at the option of the CONTRACTOR, if such failure be continued five (5) days after notice in writing to the SUBCONTRACTOR or anyone representing it in the work, such notice stating the nature of the violation of the contract, CONTRACTOR may proceed thereupon to complete the work under the terms of said contract at the cost and expense of the SUBCON-

TRACTOR, or, at the option of the CONTRACTOR, the work may be resublet at the cost and expense of the SUBCONTRACTOR.

"SUBCONTRACTOR further agrees that if it should delay the material progress of the work so as to work any damage for which CONTRACTOR shall become liable, then it shall indemnify the CONTRACTOR for the amount of any damage so caused."

■ In June, 1960, Zachry asked Miles-Sierra to bid on the producing, hauling and placement of approximately 37,000 cubic yards of riprap on a new portion of the Sante Fe railroad bed that was made necessary by construction of the dam. Zachry's contract with the Sante Fe for the relocation of that roadbed was separate from the government project contract. Miles-Sierra submitted an acceptable bid, and entered into a subcontract dated July 25, 1960 with Zachry for such work. The railroad's specifications contained no provisions for the means or method of placing the riprap, but required only the attainment of a specified end result. Miles-Sierra planned to use the semi-truck end-dump method of placing the riprap by unloading it directly on to the sides of the railroad bed from the trucks located on top of the embankment. When George Smith later arrived on the jobsite as superintendent for Miles-Sierra, he promptly informed his superiors that railroad restrictions were such that they could not use the end-dump method, and that Miles-Sierra would inevitably lose a substantial amount of money on that job. While it was to the interest of Zachry that the riprap work on the railroad bed be done within a reasonable time, that job was not so urgent that the work on the dam itself was to be delayed on account of it. The riprap work on that project furnished no adequate excuse for Miles-Sierra's delay in the performance of its work on the dam. Miles-Sierra had seven months to do that job before it ever started placing riprap on the dam. The total of 37,000 cubic yards on the railroad was only a little more than half as many

cubic yards as Zachry put in place on the dam in the first month it worked on riprapping after taking over from Miles-Sierra, and riprapping on the railroad bed was far less difficult than on Twin Buttes Dam. The fact that Miles-Sierra is claiming the railroad riprap job as an excuse for failure on the dam project over more than a year after it signed the Twin Buttes subcontract in May, 1960, shows how inadequately it was prepared to do that kind of work.

Zachry first began work on the Twin Buttes Dam project in June, 1960, and had enough earth fill in place for the commencement of riprap operations in July, 1960. When Stout and Buttles visited the project in that month, Zachry had already completed the earth work on two sections of the dam. One was approximately 4300 feet in length and 24 feet high, and the other was approximately 1000 feet in length and 25 feet high. Stout and Buttles indicated to Herbert A. Nelson, Zachry's head man on the job, that they were puzzled as to how the riprap could be put in place on embankments of that height, and that Miles-Sierra was equipped to do the work only in five foot lifts.

Smith arrived on the jobsite as superintendent in the middle of September, 1960. As far as the evidence shows, he was the only person connected with Miles-Sierra who had the know-how necessary to supervise a riprap job of the size of this dam. Shortly after his arrival, Nelson asked him to begin the riprap work, but got no results at that time.

Zachry's work on earth-fill on the embankment progressed, and there were 10,000 cubic yards of riprap bedding in place, covering an area of 3300 feet on the dam, by the end of December, 1960 in anticipation of the commencement of the placement of riprap. Miles-Sierra did not even start hauling riprap material to the damsite until the latter part of February, 1961, and it was April 25, 1961, before it began placing riprap material on the dam embankment. When Zachry took over the riprap work in July, 1961, more than a year after the

execution of the subcontract, Miles-Sierra had completed the placement of only 4000 cubic yards of riprap in a manner acceptable to the contracting officer out of the approximate total of 750,000 cubic yards required to complete the job.

During the entire period from December, 1960 to July, 1961, Zachry was constantly insisting that Miles-Sierra get along with the riprap work. Early in 1961, the Bureau of Reclamation began complaining about the lack of progress of the riprapping. Demand letters were written by Zachry and conferences were held by top executives of Zachry with executives of Miles-Sierra about the problem. At a meeting on March 27, 1961, Zachry called Miles-Sierra's attention to the fact that the delay in the riprap work had reached the point where the earth-fill and allied operations would be seriously affected, and that Miles-Sierra would have to place 60,000 cubic yards of riprap per month for the balance of 1961 to keep up.

The situation grew worse when Miles-Sierra actually began the placement of riprap. By the end of May, 1961, it had about 35,000 cubic yards in place, but the Bureau was constantly complaining to Zachry that the riprap work was slow and unsatisfactory. It was unacceptable because of excessive amounts of fines in the riprap material being used and of the large concentrations of small rocks and fines in the riprap blanket resulting from improper methods of rock placement. The Bureau Field Engineer offered various suggestions to Miles-Sierra about how their deficiencies could be corrected. In May, Zachry also assigned a man on a full time basis as a laison to assist Miles-Sierra. In spite of all that help, Miles-Sierra never got to the point where it could do the work satisfactorily to the Bureau.

Smith quit the job around the middle of May, 1961. The circumstances show that the only reasonable conclusion as to why he did so was that Miles-Sierra failed to furnish him the equipment and personnel to do the job satisfactorily, and that he decided that he did not want

the responsibility for the failure that appeared inevitable. He left and Stout placed his twenty-five year old son in charge. The boy was inexperienced and incompetent to do the work, but served the purpose of furnishing a token willingness on the part of Miles-Sierra to carry out its contract until Zachry was forced to take over.

On June 5, 1961, the Bureau wrote a letter to Zachry advising that there would be no further progress payments for the riprap work until the subcontractor's work complied with the specifications. When Miles-Sierra received a copy of the letter from Zachry asking for a definite answer as to planned corrected procedures, it answered by apologizing to Zachry for the inefficiency of its operations and set forth certain corrective actions it intended to take.

During May, 1961, the Bureau began to be concerned over the quality of the riprap rock and the excessive amount of fines in it. The Bureau's progress report for May, 1961 states that, "Difficulty is being encountered in the quarry getting acceptable rock." Correspondence between Bureau representatives having responsibility for the project stated that about one-third of the rock used in May, 1961 failed to meet the specific gravity requirements. Between May 24 and June 12, 1961, Trinity Testing Laboratories drilled a number of test holes for Zachry on Sites 1 and 2 to obtain core samples of the rock there. Exhibits admitted in evidence show the location and depth of these holes. When the Bureau got the results of the tests made on the samples, it concluded that about 50% of them failed to meet the greater than 2.45 specific gravity requirement. An inter Bureau communication obtained by discovery after this case was filed contains a statement to the effect that in view of "the prevailing lithology of the limestone beds in the San Angelo area, relaxation of the required minimum specific gravity to approximately 2.40 seems inevitable." In view of that situation, the Bureau wrote a letter dated June 16, 1961 directing that riprap placing operations be confined to areas below elevation 1900 and above elevation 1950, until further notice. The intervening area was the portion of the surface that would be subject to the heaviest wave action. On June 23, 1961, the Bureau's Assistant Commissioner and Chief Engineer sent the following teletype to Project Construction Engineer Rolin, jobsite representative at Twin Buttes Dam:

"Re conversation with F. J. Davis in your office 6-22-61. Tan to buff limestone in upper portion of quarry, Rock Site No. 1, although marginal as to specific gravity, will be acceptable if properly quarried to produce proper sizes and gradation and if quality of rock continues comparable to that at present face of quarry. Chalky portions of materials should be avoided."

This change in the specifications came within the contractual provision requiring a written change order from the Bureau. Rolin teletyped to his superior officer for approval a letter he proposed to write to Zachry authorizing the change. There is no evidence to show that authority for such a letter was given; and it was never actually written for delivery to the contractor. Although Zachry and Miles-Sierra were orally advised of the teletype shortly after it was received, neither one of them ever received a change order in writing permitting the use of any riprap material not meeting the specifications of the prime contract. Instead, Zachry received a letter from the Bureau dated June 30, 1961 containing the following: "The restriction in my letter of June 16, 1961, confining your riprap placing operations to areas below elevation 1900 and above elevation 1950, is hereby removed. Lifting of this restriction does not alter or change the provisions of Paragraph 55 and 67 of the specifications for materials and placement for riprap." Zachry sent a copy of that letter to Miles-Sierra.

The critical status of the riprap work brought about another meeting between Zachry and Miles-Sierra on June 30,

1961, at which time Zachry stated that it looked as if Miles-Sierra could not do the job and Zachry would have to take over. Miles-Sierra answered that although it had tried to perform the work satisfactorily to the Bureau, it apparently could not do so. Immediately following this meeting, Miles-Sierra representatives conferred with the Project Construction Engineer. They discussed the instructions he had received by teletype on June 23d about the use of the tan to buff colored limestone in the quarry, even though it might be of marginal quality. He also told them that they could resume riprap placement in the previously restricted areas if they would use that limestone, but they were advised that no written change order would be issued.

Miles-Sierra, after being advised of the contents of the June 23d teletype, did ramp up its operation in the quarry to reach the tan to buff colored limestone, and produced, hauled and placed it on the dam until it ceased operations shortly before Zachry took over the riprap work.

On July 1, 1961, Zachry sent a letter to Miles-Sierra advising them that unless their operations improved so as to comply with the terms of the subcontract, it would have to take over the riprap job and complete it at the expense of Miles-Sierra. A copy of such letter and a list of unpaid Miller Act claims owing by Miles-Sierra were mailed to Travelers. Each letter was received by its addressee within a few days after the date it was written. Miles-Sierra hauled and placed riprap material on the dam as late as July 1st, but by July 5th it ceased the operation of all its equipment. Travelers declined to complete the job; and Zachry, of necessity, took it over about July 11, 1961.

The riprap operations were about six months behind schedule when Zachry took over. In the first four months of its riprap operations, Zachry hauled, placed and had accepted under the relaxed specifications interpretation approximately 202,000 cubic yards of material, in spite of the fact that during such period it had to rework approximately 40,000 cubic yards that the Bureau refused to accept because it had been improperly placed by Miles-Sierra. All the riprap material accepted by the Bureau after the June 23d teletype satisfied the requirements of such teletype as to quality and gradation. Zachry completed the all the riprap work in a manner that was approved by the Bureau. The entire dam project was completed and accepted within the 1200 work days provided in the prime contract.

 When Miles-Sierra moved in to begin its operations under the subcontract, it moved its quarrying and rock moving equipment to the 15 acre tract Zachry had leased from Willeke in Site 1. While it undoubtedly intended to produce all of the necessary riprap material from that tract if it could feasibly do so, the 100 acre tract leased from Sharp in Tract 2 and the 204.5 acre tract leased from Willeke after the execution of the subcontract were available to it. Miles-Sierra knew that at all times. The Court cannot go along with Miles-Sierra's contentions that once it started to work on a tract in Site 1 or Site 2, it had made an irrevocable election to confine itself to that source alone, regardless of the adequacy of the supply. Zachry wanted the riprap subcontract performed, and it had the leases in Sites 1 and 2 for the purpose of assuring an adequate supply of material for the work, not for the purpose of setting a trap to produce endless trouble and prevent fulfillment of the contract. If Miles-Sierra entered into the performance of the subcontract with intention to carry out its obligations, it could certainly gain nothing by trying to restrict itself to 15 acres. Miles-Sierra now claims that the expense of removing the overburden would have increased as it expanded beyond the 15 acres. However, if it had been confined to the small tract, it would necessarily have had to go deeper in rock formation for its material. That kind of operation would have been more expensive than moving a few feet of overburden on the surface. Miles-Sierra did not

restrict itself to the 15 acres, and actually expanded its operations into the area covered by the 204.5 acre lease. The guarantee by Zachry in the subcontract of the adequacy of the supply of material related to the sites and not to any particular tract therein. Since the contract is unambiguous, the intention of the parties must be gathered from the four corners of it. Where it can reasonably be avoided, the court should not adopt a construction which will defeat the primary purpose of the contract. Thompson v. Waits, Tex.Civ.App., 159 S.W. 82 (1913), writ refused. It is the general rule that when one of two alternatives in a contract becomes impossible of performance, performance of the other is not thereby released. Yankton Sioux Tribe of Indians v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294 (1926); Emery Bird Thayer Dry Goods Co. v. Williams, 8 Cir., 98 F.2d 166 (1938). The Court therefore disagrees with the defendants' contention in this connection.

The Court is of the opinion that Zachry had no right to call upon Miles-Sierra to proceed with the riprap work with marginal material that might have a specific gravity as low as 2.40 instead of greater than 2.45 as provided in the specifications adopted by the prime contract, without the issuance by the Bureau of a written change order authorizing the relaxation. The change of specifications was not just a matter of interpretation of the contract by the contracting officer, as contended by Zachry. The requirement of the specification was plain, and Bureau representatives had no authority to change the specifications except in the manner provided by the prime contract. Paragraph 3 of the general conditions of that contract expressly required that any changes in the specifications be made by written change order. Under such circumstances, oral assurances by Bureau representatives on the job that material not meeting the specifications could be used were meaningless until the entire project was completed and accepted. Rosenberg v. United States, 76 Ct.Cl. 662, at page 677, in which the Court said:

"The record establishes the fact that under the specifications of the contract the cloth could not be manufactured and comply with the same. It it true the department treated this fact as a nonessential one and notified the plaintiff that specific yarn sizes were advisory only and not binding. There was nothing in the contract authorizing the plaintiff to indulge this inference. *The plaintiff could not ignore the specifications or depart therefrom without encountering the hazard of having his pay held up or perhaps receiving an order of nonacceptance of the cloth.*" (Emphasis added).

McQuagge v. United States, D.C.W.D. La., 197 F.Supp. 460 (1961), relied upon by Zachry, is distinguishable from this case on the ground that the question there was whether the government could complain of failure of a job to meet contract specifications, where it had issued a certificate of *final* acceptance and made *final* payment, if there was no collusion, fraud or obvious error. Under the provisions of the prime contract for the Twin Buttes Dam, preliminary acceptance of the riprap work was not conclusive, and the work remained subject to inspection for final acceptance at the damsite.

It is true that Zachry proceeded in reliance on the relaxation or lowering of the riprap specifications as suggested orally by the Project Construction Engineer, and that its riprap work was accepted. That does not mean, however, that it had the right to expect Miles-Sierra to do work valued in the subcontract at approximately $1,200,000.00 on the gamble that the use of marginal material might bring about rejection of the work at any time before final acceptance of the project. For this reason, and this alone, the Court concludes that Zachry is not entitled to recover on its action against Miles-Sierra and Travelers. If Zachry could get around this point, the Court would hold that the defendants are

liable because of the failure and inability of Miles-Sierra to do the job on time and in a manner acceptable to the Bureau.

 Zachry claims that this point is not available to the defendants because Miles-Sierra did not file formal notice protesting the contracting officer's action in connection with the minimum specific gravity requirement. This was not the type of situation that was contemplated by the disputes clause of the prime contract requiring notice of protests. There was no dispute of fact, and Miles-Sierra was not under contract with the government. United States v. Duggan, 8 Cir., 210 F.2d 926 (1954); E. I. Dupont de Nemours & Co. v. Lyles & Lang Construction Co., 4 Cir., 219 F.2d 328 (1955).

 The facts do not support the contentions of Miles-Sierra that its failure to do the subcontract work satisfactorily was due to inclement weather, to lack of preparation of the riprap bedding by Zachry, to the urgency of the railroad riprap job, and to an inadequate supply of riprap material that would meet contract specifications. On the other hand, the Court finds and concludes that Miles-Sierra was at all times unable to perform its obligations under the subcontract solely because of its inadequacy of proper equipment in the quarry and at the damsite, its improper methods of work at each place, and of inadequate competent personnel. Miles-Sierra failed to use diligence to commence its work within the time contemplated by the subcontract, and to maintain its schedule and rate of production to meet Zachry's requirements, which the Court finds were reasonable. The extreme slowness of its work and the constant unacceptability of it seriously impeded Zachry's allied operations at the damsite; and if Zachry had permitted Miles-Sierra to continue under the subcontract, it is reasonably probable that the project would have run over the time limit and well into the $1200.00 a day delay penalty period.

During the period of several months before Zachry took over the riprap job, when Miles-Sierra's slowness and quality of work were constantly in question, the only reason it gave, other than its own shortcomings, for the unsatisfactory type of work that it was doing was that the supply of riprap material on the 15 acre Willeke tract was inadequate. It never relied on any of the above mentioned excuses that are now offered as reasons.

The excuse about being delayed for months on riprapping the dam because of the railroad riprap work has already been adequately considered.

 Some of the claims in connection with the 15 acre tract have also been discussed, but a few additional comments are necessary. Both the 15 acre and 204.5 acre leased tracts made available to Miles-Sierra were in Site 1. While the analyses of the core samples obtained by Trinity Testing Laboratories indicated that about 50% of the samples were below 2.45 specific gravity, that meant that the other 50% did meet the specifications in the prime contract. Miles-Sierra offered inadequacy of supply as a defense to the main action and as a ground of recovery in its cross-claim and third-party action. The burden was therefore upon it to prove that inadequacy. It failed to discharge that burden.

Miles-Sierra's work was never held up on account of delay by Zachry in preparing the gravel riprap bedding. Zachry could and would have obtained the gravel on short notice, and the slope surface could and would have been prepared and bedded on two or three days notice even when Zachry had large sections of the embankment in place. It would have been unwise to put the bedding on the slope before Miles-Sierra was ready to place the riprap on it, because damage from the elements during a long wait could have resulted in having to do the work over.

There was some weather in the San Angelo area during the winter of 1960–61 that might be regarded as bad by people in that arid and generally sunny part of far West Texas. This opinion will not be lengthened by going into the details of the weather which accurately appear on the Bureau records offered in

evidence. However, the weather was not such as to prevent a diligent, adequately equipped and staffed contractor from keeping pace with the riprap work in question. This is the land where the water runs off and the ground dries out quickly. It is not uncommon to have a sandstorm in West Texas an hour or so after a rain. If the weather had been a valid excuse for a contractor working with rock, Zachry would have had even more trouble with its earthwork. Digging, hauling and placing mud would have presented more problems than similar operations with rock. Zachry kept up its work during the winter, and Miles-Sierra should have met its obligations, too. It is significant that Miles-Sierra accomplished practically nothing during the months between the time it signed the subcontract in May, 1960 and the onset of the winter weather it now claims was so bad, and that the Bureau and Zachry were constantly complaining of its slowness and delay during the several months between the end of the winter weather and the time it was relieved of the job in July, 1961. It was the latter part of April, 1961, eleven months after the execution of the subcontract, before it placed any riprap on the dam. The weather can hardly be blamed for the unsatisfactory manner in which it performed its work that followed.

Since Miles-Sierra breached the subcontract by failing to do its work diligently and acceptably, and since it was at all times unable to perform its contractual obligations to Zachry, it is not entitled to recovery on its cross-claim and third-party action. Denison Mattress Factory v. Spring-Air Co., 5 Cir., 308 F.2d 403 (1962); Matthews v. Deason, Tex.Civ.App., 233 S.W. 330 (1921) no writ history; Federal Sign Company of Texas v. Fort Worth Motors, Inc., Tex. Civ.App., 314 S.W.2d 878 (1958) no writ

history. In connection with the cross-claim and third-party action, it is also noticed that the only basis of damages is that Miles-Sierra had spent $450,461.-44 on the job on which it had been paid only $77,134.40. The only recovery it seeks is the balance of $373,3277.04. The amount of money it spent would not be a proper measure of damages, because that would include expenditures for all the work that was rejected by the government. All the rejections prior to the June 23d teletype were due to the improper manner in which the rock was sorted and placed on the embankment, rather than to the specific gravity of the material. No recovery could be allowed for money spent by Miles-Sierra for work that was unacceptable to the Bureau. It is conceded that Miles-Sierra placed only 4,000 cubic yards of riprap that were ever accepted by the government, in contrast to the 750,000 cubic yards called for by the subcontract. Zachry agreed to pay Miles-Sierra $1.60 per cubic yard for all riprap in place accepted by the Bureau, so $6,400.00 would be the amount due for the 4,000 yards. The $77,130.40, which Miles-Sierra admits it has received from Zachry, is more than enough to pay for the 4,000 yards on the dam and the 37,000 yards on the railroad bed.

The costs of court are attributable approximately as much to the cross-claim and third-party action as to the main action; so it appears just to tax them one-half against Zachry and one-half against the corporations composing the joint venture operating under the name of Miles-Sierra.

Judgment will be entered denying a recovery by Zachry on its action, and denying a recovery on the third-party action and cross-complaint, thereby finally disposing of this case.

This opinion will serve as findings of fact and conclusions of law under Rule 52(a), F.R.Civ.P.